Charles M. OBERLY, III, Attorney General of the State of Delaware, Allan P. Kirby, Jr., Grace K. Culbertson, and Ann K. Kirby, Plaintiffs Below, Appellants,

v.

Fred M. KIRBY, II, Walker D. Kirby, Fred M. Kirby, III, S. Dillard Kirby, Alice K. Horton, Jefferson W. Kirby, and F.M. Kirby Foundation, Inc., a Delaware corporation, Defendants Below, Appellees,

v.

Allan P. KIRBY, Jr., Grace K. Culbertson, and Ann K. Kirby, Cross–Claim–Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: April 17, 1990.
Rehearing en banc: Jan. 15, 1991.
Decided: June 4, 1991.

---

Fred S. Silverman, Chief Deputy Atty. Gen. (argued), and Ann Marie Johnson, Deputy Atty. Gen. (argued), Dept. of Justice, Wilmington, for appellant Charles M. Oberly, III, Atty. Gen. of State of Del.

Edmund N. Carpenter, II (argued), and Emily B. Horton, Richards, Layton & Finger, Wilmington, for individual appellees Fred M. Kirby, II, Walker D. Kirby, Fred M. Kirby, III, S. Dillard Kirby, Alice K. Horton and Jefferson W. Kirby.

Aubrey B. Lank and Brian A. Sullivan, Theisen, Lank, Mulford & Goldberg, Wilmington, for appellee F.M. Kirby Foundation, Inc.

Grover C. Brown (argued), Edward M. McNally and Mary M. Johnston, Morris, James, Hitchens & Williams, William Prickett (argued), Wayne N. Elliott and Donna A. Hoch, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington (Robert P. Buford and George R. Pitts, Hunton & Williams, Richmond, Va., of counsel), for appellants Allan P. Kirby, Jr., Grace K. Culbertson and Ann K. Kirby.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court *en banc.*

WALSH, Justice:

The opinion in this case dated November 19, 1990, which was released after argument before a panel of three justices and which affirmed the decision of the Court of Chancery, is withdrawn. The following opinion of the Court *en banc* is substituted.

This is an appeal from a bench ruling of the Court of Chancery that granted a motion to dismiss pursuant to Chancery Court Rule 41(b). The complex dispute revolves around the affairs of the F.M. Kirby Foundation, Inc. (the "Foundation"), a Delaware nonstock charitable corporation. The case began as a proceeding under 8 *Del.C.* § 225 and 10 *Del.C.* § 6501 to determine the identity of the directors and members of the Foundation. Allan P. Kirby, Jr. ("Allan, Jr."), Grace K. Culbertson ("Grace"), and Ann K. Kirby ("Ann") (collectively, the "Kirby plaintiffs") charge that their brother, Fred M. Kirby, II ("Fred"), illegally ousted them from their positions as directors. They base their claim primarily upon a bylaw amendment that purported to remove Fred's wife and children [1] from their positions as members of the Foundation and to install the Kirby plaintiffs in their place. The Kirby plaintiffs also argue that Fred breached his fiduciary duty to the Foundation by using his position to advance his personal business interests. Finally, the Kirby plaintiffs argue that Fred was never validly elected as a member of the Foundation.

After the commencement of this litigation, Charles M. Oberly, III, the Attorney General of the State of Delaware, (the "Attorney General") intervened on behalf of the public beneficiaries of the Foundation. In this appeal, the Attorney General joins the Kirby plaintiffs (collectively, the "appellants" or the "plaintiffs") in arguing that Fred had not been validly elected and that he had sought to entrench his control and to use the Foundation for personal ends. In addition, the Attorney General attacks the propriety of a 1985 transaction (the "Alleghany transaction" or the "transaction") between the Foundation and the Alleghany Corporation ("Alleghany"), charging that both Fred and the Kirby plaintiffs had breached their fiduciary duties by voting, as Foundation directors, to approve that transaction.

---

1. Fred's wife, Walker D. Kirby, and their four children, Fred M. Kirby, III, S. Dillard Kirby, Alice K. Horton, and Jefferson W. Kirby, are named together with him and the Foundation itself as defendants. We refer to them collectively as the "appellees" or the "defendants."

Although we would have preferred a more formal ruling by the Court of Chancery in such a complex case, we find no error in the decision to dismiss all claims. The fundamental question underlying many of the appellants' claims is whether the defendants acted in a manner that was consistent with the charitable purposes for which the Foundation was established. Thus, even if the transaction challenged by the Attorney General is viewed as presenting a conflict of interest to the Foundation's directors, we conclude that it was a fundamentally fair transaction and therefore did not jeopardize the charitable goals of the Foundation. Similarly, while it is apparent that Fred exercised tight control over the Foundation and sought to solidify that control, none of his challenged actions impaired the work of the Foundation or were impermissible under the Certificate of Incorporation (the "Certificate") and the bylaws of the Foundation. In contrast, the bylaw amendment adopted by the Kirby plaintiffs was wholly inconsistent with the Certificate. Because the Court of Chancery's factual findings are amply supported by the record and because its legal rulings are correct, we affirm.

I

The parties to this appeal continue to dispute several of the facts underlying the litigation. Moreover, the findings of fact of the Court of Chancery are scattered throughout several unreported opinions and a bench ruling. Therefore, an extended discussion of the events that gave rise to the case, as reflected in the record before us, is required.

The Foundation was organized in 1931 by Fred M. Kirby ("Kirby"), the grandfather of Fred and the Kirby plaintiffs. Kirby had made his fortune from a chain of five-and-dime stores that eventually became a part of the F.W. Woolworth Corporation. He donated a portion of his wealth to establish the Foundation, which, under the terms of the Certificate, is "[t]o be conducted and operated ... exclusively for religious, charitable, scientific, literary and educational purposes." The Foundation is to be managed by a board of directors, the size of which is not specified. Under Delaware law, the members of a nonstock corporation have the power to elect its directors. 8 *Del.C.* §§ 141(j)–(k), 215. The original members of the Foundation were its incorporators: Kirby; his lawyer, Walter Orr ("Orr"); and E.P. Schooley ("Schooley"), one of Kirby's employees. Article EIGHTH of the Certificate establishes the conditions of membership:

1—Only individuals interested in the objects and purposes of the corporation are eligible to become members. New members of the corporation, without limit as to number, may be elected by majority vote of the old members. A member may voluntarily withdraw from the corporation at any time. There shall be at all times not less than three members of the corporation, and if, at any time, the total membership shall fall below three members, whether by reason of death, voluntary withdrawal or otherwise, the two remaining members, or the one remaining member, as soon as practicable, shall elect or select a new member or members at least sufficient to bring the total membership up to three members.... [I]n the event there shall at any time cease to be any members of the corporation, then the executors or administrators of the last three members to have their membership terminated by death, shall elect three new members. If at the time there shall cease to be any members of the corporation, there shall not be as many as three former members whose membership was terminated by death, then the executors or administrators of the last two members or the last one member, as the case may be, to have their or his membership terminated by death, shall elect or select three new members....

In short, the Foundation's members are entitled to elect both directors and new members. At least three members must serve at all times.

The Foundation's first members' meeting was held on January 15, 1931. At that

meeting, Schooley resigned[2] and the remaining members elected Kirby's son, Allan P. Kirby, Sr. ("Allan, Sr."), to replace him. The three members, Kirby, Orr, and Allan, Sr., then elected themselves directors. In 1938, Kirby resigned as director and was replaced by Schooley. Kirby died two years later and Orr and Allan, Sr. served as the only members of the Foundation until May 6, 1942, at which time Schooley was again chosen to fill out the required complement of members.[3]

By June 12, 1952, Schooley had apparently again resigned from his position as member. At that time, a members' meeting was called and Fred, Allan, Sr.'s son, was elected a member. On October 6, 1953, Orr and Schooley resigned as directors and the members—Allan, Sr., Orr, and Fred—elected Fred and his three siblings—now the Kirby plaintiffs—to serve as directors. In 1961, Orr died and neither Fred nor Allan, Sr. saw fit to replace him. Thus, the Foundation was left without the full slate of members required by the Certificate. In 1967, Allan, Sr. suffered a debilitating stroke that incapacitated him until his death in 1973. At the time, Fred was left as the sole member of the Foundation, while his siblings continued to serve with him as directors. This state of affairs continued unchanged until 1984.

For the first fifty years of its existence, the identity of the members and directors of the Foundation was not a point of contention. To all appearances, the Foundation carried about its business in an expeditious manner, investing its assets profitably and funding a wide variety of charitable endeavors. At first, Kirby was largely responsible for running the Foundation, later Allan, Sr. took over and eventually Fred assumed prime responsibility. The directors met infrequently, and meetings of the membership became impossible after 1973 since Fred was the sole member.

Beginning in 1981, for reasons that are not apparent, the directors, consisting of Fred and his three siblings, began to meet on a much more frequent basis. At the July 22, 1981 meeting, it was "decided that each Director may bring one blood-related child to the next meeting for the purpose of general familiarization with the affairs of the Foundation and to test the interest of the younger generation therein." In April, 1984, notwithstanding this apparent intention to involve the children of all the directors in the Foundation's governance, Fred secretly selected his wife and four children to serve as members. At trial, Fred testified that he had delayed selecting new members for such a long time because he had been uncertain who could best serve the Foundation. He claimed that his selection of his immediate family was not intended to foreclose election of other members in the future, but that he chose his wife and children because he had great confidence in their abilities. Nevertheless, he kept the enlargement of the membership secret from his fellow directors, apparently because he knew that his siblings would be upset if they knew.

Throughout Fred's tenure as sole member, the Kirby plaintiffs had periodically requested that Fred make them members as well as directors. They reiterated this request on April 1, 1986, in a letter written by Allan, Jr. Fred responded in a letter dated April 21, in which he informed his siblings of his secret decision appointing his wife and children as members. The Kirby plaintiffs reacted by demanding that Fred seek the resignation of his wife and

**2.** Schooley was reelected as a member in 1942 and apparently resigned again sometime prior to 1952. However, there is only one written resignation surviving in the Foundation's records and it is undated. During discovery, the defendants temporarily contended that the undated resignation was executed following 1942. However, all parties now agree, and the lower court found, that the undated resignation was executed in 1931. Schooley's irregular service as a member, which we discuss further below, is a source of contention between the parties.

**3.** The circumstances underlying this election are still in dispute. To bolster their contention that directors as well as members may elect members, the Kirby plaintiffs argue that Schooley was elected by all three directors—Allan, Sr., Orr, and Schooley himself. The lower court found, however, that Schooley had been elected by Allan, Sr. and Orr alone.

children and appoint a slate of members that fully represented the various descendants of Allan, Sr. Fred agreed only to discuss the dispute at the next directors' meeting on June 5.

At a luncheon on the day of the directors' meeting, the Kirby plaintiffs discussed strategy. They agreed that they would attempt to convince Fred to alter the Foundation's membership. However, if persuasion failed, they resolved to propose and adopt an amendment to the bylaws that purported to force out Fred's wife and children and replace them with the Kirby plaintiffs. At the subsequent meeting, Fred refused to entertain his siblings suggestions. Accordingly, Allan, Jr. introduced the following resolution:

> RESOLVED that the By-laws be amended so as to provide for the Board of Directors, and only the Board of Directors, to constitute the Members of the Corporation.

Fred argued that the resolution was contrary to the Certificate and illegal under Delaware law. Nevertheless, the Kirby plaintiffs adopted the resolution over Fred's opposition. For two months, the two factions disputed the legality and advisability of the new bylaw. Both sides sought, and received, legal opinions that supported their respective positions. On August 13, 1986, however, Fred met with his wife and children. Purporting to act as members, they removed the Kirby plaintiffs from their positions as directors and elected themselves to serve in their place. Thus, when the dust had settled, Fred and his immediate family purported to have exclusive control over the Foundation.

The Kirby plaintiffs filed this action on August 29, 1986, in an effort to regain their positions in the Foundation and to oust Fred's family. Initially, they sought declaratory relief pursuant to 8 *Del. C.* § 225 and 10 *Del. C.* § 6501, to determine the identity of the Foundation's members and directors. The defendants moved unsuccessfully to dismiss this claim pursuant

to Chancery Court Rule 12(b)(6), alleging a failure to state a claim upon which relief could be granted. Thereafter, the Kirby plaintiffs amended their complaint, primarily to argue that Fred had breached his fiduciary duties to the Foundation by seeking to entrench his control of it. The Attorney General was permitted to intervene as a party plaintiff and joined the Kirby plaintiffs in arguing that Fred had acted to solidify his control.[4] In addition, the Attorney General charged that both Fred and the Kirby plaintiffs had breached their duties as directors by approving an interested transaction between the Foundation and the Alleghany Corporation. We now turn to the facts relevant to this aspect of the litigation.

After Kirby had made his fortune in retail stores, his son, Allan, Sr., went on to achieve his own successes in the business world. The primary vehicle for his endeavors was Alleghany, originally a railroad holding company. In 1966, Allan, Sr. bequeathed approximately one million shares of Alleghany stock to the Foundation; the bulk of these shares were transferred when Allan, Sr.'s estate was settled in 1976. From that time forward, Alleghany stock was by far the Foundation's largest asset. In 1985, just prior to the transaction under challenge, the Foundation held a 15% stake in Alleghany, while Alleghany stock constituted 80% of the Foundation's assets. Large blocks of Alleghany stock also came to be held by Fred and his siblings.

After Allan, Sr.'s incapacitation, Fred took over control of Alleghany, becoming chairman of its board of directors and its chief operating officer. Under his direction, the company flourished by selling its railroad assets and assembling a diversified array of subsidiaries, including a financial services firm called Investors Diversified Services ("IDS"). In a 1984 transaction, Alleghany sold IDS to the American Express Company ("American Express") in exchange for 11.5 million shares of American Express common stock, then worth

---

**4.** The Attorney General was acting pursuant to his common law power to protect the beneficiaries of charitable corporations and trusts.

See *Wier v. Howard Hughes Medical Inst.*, Del. Ch., 407 A.2d 1051 (1979).

$370 million. This transaction left Alleghany as the single largest shareholder of American Express and secured Fred a seat on the American Express board of directors.

Alleghany's business successes redounded to the benefit of the Foundation since the Foundation's assets were composed primarily of Alleghany stock. However, the Foundation's reliance upon the value of Alleghany stock could not continue indefinitely. In 1969, Congress had enacted section 4943 of the Internal Revenue Code as part of the Tax Reform Act of that year. Under section 4943, a tax-exempt nonprofit foundation incurs a special excise tax on so-called "excess business holdings" that it owns after a certain date. "Excess business holdings" are defined as an interest in the stock of any given corporation that exceeds a specified percentage of the corporation's outstanding shares. The purpose of this provision is to discourage the use of nonprofit foundations as a device for controlling the governance of a for-profit corporation. *See* H.R.Rep. No. 91–413, 91st Cong., 1st Sess. 1, 27–31, *reprinted in* 1969 *U.S. Code Cong. & Admin.News* 1645, 1671–75. Because the Foundation's directors themselves held large blocks of Alleghany stock, the Foundation could own no more than two percent of Alleghany's voting stock nor more than two percent of the value of all Alleghany stock. I.R.C. § 4943(c)(2). The Foundation was required to reduce its holdings to this level by 1986 or face the additional tax.

In 1985, as the Foundation's deadline for divesting its Alleghany stock approached, Alleghany's management became aware of a provision of the Internal Revenue Code that would allow it to avoid paying capital gains tax on assets used to redeem its own stock when that stock constituted "excess business holdings" in the hands of a foundation. I.R.C. § 311(d)(2)(D) (1985).[5] The American Express stock that Alleghany had acquired in exchange for IDS had appreciated considerably since 1984; as a result, an exchange of the Foundation's Alleghany stock for Alleghany's American Express stock immediately appeared as an attractive transaction for both entities. Both entities could realize substantial profits, but Alleghany would pay no tax and the Foundation would pay only the two-percent excise tax that applies to all profits of private foundations. There was a complicating factor, however. Fred was both the chairman of Alleghany and the president of the Foundation's board. Allan, Jr. was a director of both Alleghany and the Foundation. All four Foundation directors held substantial blocks of Alleghany stock. Thus, the proposed swap would constitute the virtual paradigm of an "interested" transaction.

Fred initially considered hiring an investment banker to negotiate on behalf of the Foundation, but ultimately decided to entrust the matter to the Foundation's long-time attorney, Harry Weyher ("Weyher"). Weyher was instructed to reach an agreement with Alleghany that would be fair to the Foundation, but was not authorized to seek out other potential buyers of the Alleghany stock. Alleghany's board, meanwhile, retained Merrill Lynch Capital Markets ("Merrill Lynch") to represent Alleghany. Negotiations began on August 1, 1985 and continued through mid-September, when a stock purchase agreement was finalized. Merrill Lynch began negotiations by suggesting that the Alleghany shares be bought at a discount below the market price, since the Foundation had to sell its shares and since possible alternative transactions all suffered from significant drawbacks. Merrill Lynch pointed out that because the Foundation was an "affiliate" of Alleghany within the meaning of Securities and Exchange Commission Rule 144, 17 C.F.R. § 230.144, and because it had received its Alleghany stock from Allan, Sr., who was also an Alleghany "affiliate," it could not sell its stock to another buyer without either registering it under the Securities Act of 1933 or complying with the "safe-harbor" provisions of Rule 144. Registration would force the Foundation to incur significant transaction costs, and a large public sale would likely drive down

---

5. I.R.C. § 311(d) was repealed by the Tax Reform Act of 1986.

the market price, since the number of shares to be sold was large relative to the size of the existing market. Compliance with Rule 144, on the other hand, would limit the liquidity of the shares in the hands of the buyer for a period of two years. As a result, a substantial discount would likely be demanded by any potential buyer.

Weyher countered Merrill Lynch's argument by contending that the important consideration was the fairness of any transaction to both parties, not the Foundation's supposed weak bargaining position. He suggested that because Alleghany would gain substantial tax benefits from dealing with the Foundation, it should share those benefits with the Foundation by paying a premium for the Alleghany shares. In short, Merrill Lynch insisted on a discount and Weyher demanded a premium. Price, however, was the only significant point of contention between the two sides. After several weeks of disagreement, the parties finally agreed to "split the difference" and exchange their shares at market prices: the Foundation's 1,118,826 Alleghany shares would be swapped for 2,062,940 shares of unregistered American Express stock, an exchange ratio that reflected the market price of the two stocks on August 23, 1985. Although Merrill Lynch opined that the transaction was fair to Alleghany, the Foundation never retained an investment banker to offer a fairness opinion.

The Foundation board unanimously approved the transaction on September 25, 1985. Alleghany's board had approved the transaction at a September 18 meeting in which Fred and Allan, Jr. did not participate. Alleghany shareholders approved the exchange at a meeting on November 7, 1985, and the exchange was executed shortly thereafter.

In the three years between the filing of this action and trial, the Court of Chancery ruled on a series of preliminary matters, including a motion by the Kirby plaintiffs that would have permitted them to participate in the Foundation's management *pendente lite* and various motions to dismiss

by the defendants. The case eventually proceeded to trial on October 2, 1989.

The Kirby plaintiffs and the Attorney General presented evidence for five days, at the conclusion of which, the defendants moved to dismiss all claims under Chancery Court Rule 41(b). In a bench ruling, the court held that Fred was a valid member of the Foundation and that he had acted legally in appointing his wife and children as members and removing his siblings from the board. By contrast, the court found that the bylaw amendment adopted by the Kirby plaintiffs was invalid under the Foundation's Certificate. Finally, the court held that the defendants had breached none of their fiduciary duties and that the Alleghany transaction was fundamentally fair to the Foundation.

## II

Having delved deep into the records of the Foundation's early history, the appellants have crafted an unusual argument: they contend that Fred was never properly elected a member in 1952 and hence never had the power to appoint his wife and children as members or to remove his siblings from the board. This argument stems from the rather haphazard record-keeping of the Foundation during much of its history. Because Kirby, Allan, Sr., and Fred successively ran the Foundation almost single-handedly, the members and directors of the Foundation rarely met and the records of what transpired at and between meetings are quite fragmentary. As a result, it is unclear whether or not E.P. Schooley was a member in 1952 when Fred was elected a member. The appellants contend that Schooley *was* a member in 1952 and that because he was not notified of the meeting at which Fred was elected, the actions undertaken at that meeting are invalid and void. *See Schroder v. Scotten, Dillon Co.*, Del.Ch., 299 A.2d 431 (1972); *Bryan v. Western Pac. R.R.*, Del.Ch., 35 A.2d 909 (1944). The appellants' claim hinges upon the factual question of whether or not Schooley was a member in 1952. The Vice Chancellor ruled that he was not. However, because

the Vice Chancellor based his findings upon a limited "paper" record, we are not bound by such findings if they are clearly erroneous based on our view of the record. *Fiduciary Trust Co. of N.Y. v. Fiduciary Trust Co. of N.Y.*, Del.Supr., 445 A.2d 927, 930 (1982).

Without question, Schooley was one of the founding members of the Foundation. At its first meeting on January 15, 1931, however, he resigned and was replaced by Allan, Sr. An undated resignation was placed in the Foundation's files along with the minutes of the 1931 meeting, and all parties now agree that this resignation was executed in 1931. Eleven years later, on May 6, 1942, Schooley was once again chosen to serve as a member. There is no direct evidence, such as a letter of resignation, to indicate that Schooley ever resigned from this post. However, the minutes of the 1952 meeting at which Fred was elected recite that Allan, Sr. and Walter Orr were then the only members of the Foundation. Thus, the Vice Chancellor concluded that although no record of Schooley's resignation exists, he had in fact resigned sometime between 1942 and 1952.

■ When called upon to base a factual determination upon such a sparse and equivocal body of evidence, a trial judge must establish some rational basis for favoring one conclusion over another and answering a question that cannot be answered with a high degree of certitude. Since Allan, Sr., Schooley, and Orr are long dead, no one can be wholly certain whether Schooley was or was not a member in 1952. However, the Vice Chancellor decided that more weight should be given to the affirmative statements of Allan, Sr. and Orr in the minutes of the meeting than to mere inferences that might be drawn from the absence of a formal resignation. Allan, Sr. was a highly successful businessman and Orr was a competent and respected lawyer; the Vice Chancellor considered it unlikely that they simply forgot that Schooley was a member. He found it to be more likely that Schooley's resignation was lost or was never formally executed or recorded. Moreover, the Vice Chancellor found it sig-

nificant that Schooley never objected to the validity of the 1952 meeting, even though he served as a director of the Foundation until 1953 and would have been aware of the 1952 members' meeting.

■ Under our standard of review, we cannot conclude that these findings are incorrect. We might perhaps question the Vice Chancellor's estimation of Orr and Allan, Sr.'s attentiveness, since they undoubtedly either forgot that Schooley was a member or forgot to insure that Schooley's resignation was duly preserved in the Foundation's records. Nevertheless, the Vice Chancellor's decision to give more weight to an affirmative statement than to a possible negative inference clearly constituted a rational basis for evaluating the available evidence. Moreover, the burden of proving the invalidity of Fred's election rested upon the appellants. *Oberly v. Howard Hughes Medical Inst.*, Del.Ch., 472 A.2d 366, 386–87 (1984). Before a court declares invalid a corporate election that was held thirty-seven years ago and thereby upsets long-settled expectations and reliance upon assumed events, it is entitled to demand clear and convincing evidence that the election was, in fact, invalid. The appellants clearly cannot meet this burden by expecting the court to draw inferences from a *lack* of evidence. Accordingly, we accept the Vice Chancellor's finding that Fred was validly elected as a member in 1952.

### III

■ We now consider the legality of the Kirby plaintiffs' bylaw amendment. Although the bylaw amendment is the focus of the Kirby plaintiffs' claim to be directors of the Foundation, the issues involved are not overly complex. Essentially, we are called upon to interpret the Certificate of Incorporation and determine whether the bylaw amendment is permitted or forbidden by the Certificate. Because the Certificate is a document in the nature of a contract, its construction raises legal questions that are subject to *de novo* review by this Court. *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339, 342–43 (1983);

*Rohner v. Niemann,* Del.Supr., 380 A.2d 549, 552 (1977).

Article EIGHTH, Section 1 of the Certificate establishes the means by which members of the Foundation are chosen: "New members of the corporation, without limit as to number, may be elected by majority vote of the old members." The language of this provision is clear and unambiguous. Nevertheless, the Kirby plaintiffs argue that the Foundation's directors also are given the power to choose members under Article EIGHTH, Section 2:

> The corporation may establish and put into effect such further rules, regulations and orders governing admission to membership, duties and obligations of members, provisions for suspension, reprimands or expulsion from membership and classification of members as the bylaws shall from time to time provide and as shall not be inconsistent with Section 1 of this Article.

Under Article TENTH, Section 1 of the Certificate, the directors have the power to amend the Foundation's bylaws. The Kirby plaintiffs argue that their bylaw amendment, which provided that only directors could be members, was nothing more than a "further rule[ ] ... governing admission to membership." Thus, they contend that the simple expedient of amending the bylaws allows directors, as well as members, to elect the Foundation's members.

The Kirby plaintiffs' argument has some superficial appeal. The language of Article EIGHTH, Section 2 is quite expansive; it allows the directors to oversee virtually all aspects of the membership, including admission, duties and obligations, and expulsion. Nevertheless, we find that the bylaw amendment in question is inconsistent with the overall structure of the Foundation and with the specific requirements of Article EIGHTH, Section 1.[6]

The management structure of the Foundation is roughly analogous to that of a for-profit corporation. In a corporate business enterprise, the board of directors has broad authority to manage the affairs of the corporation, but the directors hold their offices at the sufferance of the shareholders. 8 *Del.C.* § 141(k). Beyond the power to vote for directors and to participate in annual meetings, shareholders have limited direct authority. But the enterprise is owned by the shareholders and they cannot be forced out of the corporation except in special circumstances, and then they must be fully compensated for their interests. *E.g.,* 8 *Del.C.* § 253 ("short form" merger statute). The directors wield more power on a day-to-day basis, but they are subordinate to the stockholders and have no control over the identify of the stockholders.[7]

Under its Certificate, the Foundation is to be managed by the directors, who are elected by the members. The members, in turn, have no other duties; however, they hold their positions by virtue of being "interested in the objects and purposes of the corporation." The original members were the Foundation's founder and his handpicked associates; their successors have been the direct descendants of the founder. Thus, while the members do not "own" the Foundation in the sense of having a pecuniary interest in its existence, they have been responsible for its creation and continued endowment. They have been the Foundation's "investors."

The analogy between members and stockholders is, perhaps, an imperfect one. Notably, stockholders do not elect other stockholders. Moreover, the Foundation must be managed on behalf of its beneficiaries, not its members. In light of the role of the members in creating the Foundation and electing its directors, however, we think it clear that the members' power was intended to resemble that of stockhold-

---

6. In reality, the language of Section 2 barring inconsistency is legally redundant, since a corporation's bylaws may never contradict its certificate of incorporation. 8 *Del.C.* § 109(b); *Brooks v. State ex rel. Richards,* Del.Supr., 79 A. 790 (1911).

7. Of course, a corporation's stockholders may elect themselves directors, but there is a fundamental distinction between the powers that they exercise in each capacity.

ers.[8] As a result, we do not believe that the Foundation's members can be ousted by the very directors whom they have elected. Any other interpretation would render the Foundation's corporate structure fundamentally unstable.

The rules of contractual construction also support our interpretation of the Certificate. Article EIGHTH, Section 1 unambiguously vests the members with the power to elect new members. Section 2, while giving the directors power to regulate membership, does not mention the election of members. If the drafters of the Certificate had intended to give the directors such power, they could have done so explicitly, by using language similar to that found in Section 1. Instead, Section 2 speaks in extremely general terms. Thus, we believe, as the Vice Chancellor found, that Section 2 empowers the directors to establish general criteria for membership or mechanisms for disciplining or removing members. It does not, however, empower directors to make specific decisions about which individuals should or should not be members. The Kirby plaintiffs' bylaw amendment may be cast in neutral-sounding language, but it was clearly designed to remove certain individuals from membership and replace them with others. Accordingly, it is directly in conflict with the election mechanism established by Section 1.

The Kirby plaintiffs place heavy reliance upon two decisions to support their claim. First, they cite *Denckla v. Independence Foundation*, Del.Ch., 181 A.2d 78 (1962), *aff'd*, Del.Supr., 193 A.2d 538 (1963). *Denckla* also involved a dispute over the control of a charitable corporation, the Independence Foundation ("Independence"), which had a structure similar to that of the Kirby Foundation, in that it was governed by directors who were chosen by members. At some point in the course of the *Denckla* dispute, the Independence directors met

and "the By–Laws were amended to provide that the officers of the Foundation should *ex officio* be members." 193 A.2d at 540. Thus, the Kirby plaintiffs suggest that the power that they claim for themselves is permissible under Delaware law. It should be noted, however, that the validity of the bylaw amendment was not at issue in *Denckla*. More important, the bylaw amendment there did not conflict with Independence's certificate of incorporation. The method for electing members was established by Independence's bylaws, rather than by its certificate. *See Denckla*, 181 A.2d at 80–81. Thus, the directors were free to alter the method simply by amending the bylaws. By arguing that *Denckla* establishes the power of directors to elect members under Delaware law, the Kirby plaintiffs misapprehend the meaning of the lower court's ruling. Their proposed amendment is invalid not primarily because it violates Delaware law, but because it is contrary to the Foundation's Certificate. It violates Delaware law only because it is contrary to the Certificate.

The Kirby plaintiffs also rely upon a series of cases involving the affairs of the Osteopathic Hospital Association of Delaware (the "Hospital"). *In re Osteopathic Hospital Ass'n of Del.*, Del.Ch., 191 A.2d 333 (1963), *aff'd*, Del.Supr., 195 A.2d 759 (1963). There, the Hospital was governed by a board of trustees and by a large body of members who were primarily physicians. Under the explicit and unambiguous terms of the Hospital's certificate of incorporation, members elected trustees and the trustees selected physicians for admission to membership. Thus, the structure of the Hospital was quite different from that of the Foundation. Under the Hospital's bylaws, however, nonphysicians could be selected as members only with the concurrence of a majority of the members. Notwithstanding this provision, the trustees amended the bylaws to make themselves

---

**8.** The parallel between stockholders and members is clearly contemplated in relevant statutory law. For example, 8 *Del.C.* § 141(j), which governs the relationship between the members and directors of a nonstock corporation, states "[e]xcept as may be otherwise provided by the certificate . . ., section [141] shall apply to . . . a [nonstock] corporation, and when so applied, all references to . . . stockholders shall be deemed to refer to . . . the members of the corporation. . . ."

members. As a result, laymen became members of the Foundation without any input from existing members. In the ensuing litigation, it was ruled that although the bylaw amendment was facially valid, it was legally unreasonable because it upset the members' settled expectation of being able to vote upon the admission of laymen. Thus, rather than supporting the Kirby plaintiffs' argument that directors of a non-stock corporation have power to elect its members, the *Osteopathic Hospital* cases stand for the principle that even where directors are given such power by a certificate of incorporation, they may not exercise it unreasonably. The case now before this Court is one in which the directors have no such power to begin with.[9]

The Kirby plaintiffs also point to the minutes of a meeting of the board of directors held on May 6, 1942 to support their contentions. The minutes reflect that the then-directors—Allan, Sr., Orr, and Schooley—were all present. They then recite:

> The Chairman [Allan, Sr.] stated that it was necessary to elect a new member of the Corporation. Mr. E.P. Schooley was thereupon nominated to be a member of the Corporation and upon motion duly made, seconded and unanimously carried, Mr. Schooley was declared duly elected a member of the Corporation. Mr. Schooley accepted membership in the Corporation.

The Kirby plaintiffs view these minutes as proof that all three of the directors, including Schooley himself, voted to elect Schooley as a member. They then claim that this incident supports their contention that directors may elect members. The Vice Chancellor found, however, that Allan, Sr. and Orr acted in their capacity as members to elect Schooley. We agree. If the directors had sought to exercise the power

that the Kirby plaintiffs claim they enjoy, they would have had to amend the bylaws in order to elect Schooley. Article EIGHTH, Section 2 clearly states that "[t]he corporation may establish ... such further rules ... governing ... membership ... *as the by-laws shall from time to time provide.*" (emphasis added). There is no mention of a bylaw amendment in the minutes of the 1942 meeting. Thus, we can conclude either that the directors were purporting to exercise a power that even the Kirby plaintiffs do not claim they have, or that Allan, Sr. and Orr acted as members when they elected Schooley. The Vice Chancellor reached the latter conclusion, and we have no reason to disagree.

■■■■ Finally, the Kirby plaintiffs argue that the Vice Chancellor's interpretation of the Certificate was erroneous in that it contradicted an earlier ruling by another Vice Chancellor in the same case. On July 29, 1987, Vice Chancellor Berger denied the defendants' motion to dismiss under Chancery Court Rule 12(b)(6). In doing so, she found that the terms of the Certificate governing the election of members were arguably ambiguous and that they would have to be construed on the basis of evidence presented at trial. The Kirby plaintiffs contend that this ruling established the "law of the case" and that as a member of the same court that had rendered this ruling, the trial judge, Vice Chancellor Chandler, could not contradict it. We must confess to finding this argument somewhat abstruse. The procedural posture of the case when each of the Vice Chancellors examined it was quite different. Under Rule 12(b)(6), the trial court must decide whether the plaintiffs state a claim under any possible set of facts that they might prove. Thus, Vice Chancellor Berger found that if, for example, the ap-

---

**9.** The Kirby plaintiffs also cite a third *Osteopathic Hospital* case, *In re Osteopathic Hospital Ass'n of Del.*, Del.Ch., 197 A.2d 630 (1964). The recitation of the facts in that case contradicts the recitation in the earlier cases, in that it cites a certificate provision allowing members to "be elected in the manner provided by the By-laws." 197 A.2d at 631. The earlier cases quote a certificate provision that directly empowers

trustees to elect members. We can only conclude that the certificate had been amended before the 1964 case. Under either provision, however, the trustees of the Hospital were given far more power to control the election of its members than are the directors of the Foundation. Thus, the case provides no support for the Kirby plaintiffs' argument.

pellants proved that Kirby had intended directors to have the power to select members, the plaintiffs might be entitled to relief. When the case came before Vice Chancellor Chandler under Chancery Court Rule 41(b), however, the trial court was called upon to decide whether, on the evidence presented, the plaintiffs had succeeded in proving that their interpretation of the Certificate was the correct one. He found that they had not and ruled that the defendants' construction of the Certificate was the only reading that was logically consistent with the overall structure of the Foundation. Thus, Vice Chancellor Chandler simply resolved the ambiguity that Vice Chancellor Berger had identified under a different procedural standard. *Cf. Farmer in the Dell Enters. v. Farmers Mut. Ins. Co. of Del.*, Del.Supr., 514 A.2d 1097, 1099 (1986).[10]

In sum, we find that the Vice Chancellor's decision under 8 *Del.C.* § 225 and 10 *Del.C.* § 6501 must be affirmed. Fred was validly elected a member in 1952. As a member, he clearly had the power to elect other members. Under the Certificate, the Foundation's directors have no power to elect members. Thus, the June 5, 1986 bylaw amendment was invalid as a matter of law and did not have the effect of removing Fred's wife and children from the membership or of replacing them with the Kirby plaintiffs. As validly elected members, Fred and his wife and children had the power to remove the Kirby plaintiffs from their seats as directors and to elect themselves in their place.

## IV

We now turn to the more complex question of whether Fred's actions violated his fiduciary duty to the Foundation. In essence, the appellants argue that Fred engaged in practices designed to place him in personal control of the Foundation and to promote his business interests rather than the welfare of the Foundation and its beneficiaries. Specifically, they criticize his failure to appoint two additional members during the first eleven years after Allan, Sr.'s death, his decision to conceal the appointment of his wife and children from his fellow directors, his alleged falsification of the minutes of the June 5, 1986 directors meeting, and his decision to oust the Kirby plaintiffs as directors and replace them with five individuals who have only limited business and philanthropic experience. In addition to these charges, the Attorney General argues that Fred breached his fiduciary duty by directing that shares of stock held by the Foundation be voted to support his election to the boards of directors of Alleghany, American Express, the F.W. Woolworth Corporation, and the Pittston Company.[11]

To resolve these claims, we are required to delineate the exact scope of the fiduciary duties imposed on Fred and, to a lesser degree, the other individuals who functioned as members and/or directors of the Foundation. Accordingly, it is important that we apply a searching standard of review in determining the legal standards that govern the appellees' actions. *Fiduciary Trust Co.*, 445 A.2d at 930. However, to the extent that the appellants' claims call into question the trial court's factual findings, its rulings are entitled to greater deference. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

The Kirby plaintiffs agree that Fred's fiduciary duty is measured under standards developed in the jurisprudence of for-profit corporations.[12] Although the Foundation was established for limited charitable purposes, as its certificate attests, the "extent and measure of that

---

10. Even if Vice Chancellor Chandler had contradicted the "law of the case," our own standard of review would render any appeal from such error moot. We review the interpretation of the Certificate *de novo*. Thus, because we find Vice Chancellor Chandler's reading of the Certificate to be clearly correct, we could affirm that interpretation even if it had contradicted an earlier ruling of the Court of Chancery.

11. The Kirby plaintiffs also originally challenged the voting of proxies but have abandoned this claim upon appeal.

12. The Attorney General would hold all Kirbys to a higher standard evolving from trust principles. *See infra*, Part V.

trust" must be determined by the Certificate of Incorporation and the Corporate By–Laws. *Denckla v. Independence Foundation*, 193 A.2d at 541. Fred's status as the surviving member created a fiduciary responsibility comparable to that owed by a controlling shareholder to the corporation, and to other shareholders, to act with fairness and loyalty, devoid of considerations of self-interest. *Guth v. Loft Inc.*, Del.Supr., 5 A.2d 503, 510 (1939); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985).

■ The Kirby plaintiffs are not shareholders, however, and have no legitimate expectation of financial benefit from the operation of the Foundation. While they have the right, as ousted directors, to seek judicial review of Fred's actions as a fiduciary, the focus of that scrutiny is limited to (a) any financial harm or jeopardy to the Foundation itself and its beneficiaries and (b) any personal benefit to Fred or his family, notwithstanding the absence of harm to the Foundation.

### A.

■ Although the Vice Chancellor made no explicit findings upon the question, it seems clear to us that Fred engaged in a course of behavior designed to enhance his immediate family's control of the Foundation. Moreover, whether or not he had a long-standing plan to exclude other branches of the Kirby clan from the Foundation, his decision to remove his siblings from the board assuredly achieved that result. Thus, if we assume that Fred's influence over his wife and children is strong, the appellants are correct in their assertion that Fred now enjoys "entrenched" control of the Foundation.

■ In arguing that such entrenchment constitutes a breach of fiduciary duties, the Kirby plaintiffs characterize Fred's actions as a "takeover" and then cite several decisions of this Court that arose out of battles for control of large, publicly held, business enterprises. *E.g., Mills Acquisition Co. v. MacMillan, Inc.*, Del.Supr., 559 A.2d 1261 (1989); *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346 (1985); *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). However, the parties' struggle for control of the Foundation is in no way comparable to a takeover scenario. As controlling member, Fred was not called upon to evaluate the advisability of a course of action that promised an increased short-term value for beneficiaries but that posed a threat to his position in the Foundation. In electing new members and replacing the former directors, he was simply exercising one of the basic powers of membership granted to him, *qua* member, under the Certificate. Moreover, his decisions were not fundamentally financial ones; at most, they could have only an indirect effect upon disbursements to beneficiaries. Unless his conduct reflects disloyalty to the Foundation or threatens the interests of its beneficiaries, it may not be a basis for his removal.

■ A court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries, any more than it can question the business judgment of the directors of a for-profit corporation. However, because the Foundation was created for a limited charitable purpose rather than a generalized business purpose, those who control it have a special duty to advance its charitable goals and protect its assets. Any action that poses a palpable and identifiable threat to those goals, or that jeopardizes its assets would be contrary to the Certificate and hence *ultra vires. See Denckla*, 193 A.2d at 541. Since Fred owes fiduciary loyalty to the Foundation in his capacity as member as well as director, we must consider whether his selection of his wife and children as members and directors meets this fiduciary standard. Only by applying this standard can a court of equity fully protect the interests of the Foundation's beneficiaries. It is not clear from the Vice Chancellor's bench ruling whether he applied such a standard or whether he simply deferred to the elective power of Fred. However, because this Court reviews questions of law and equity *de novo*, we are required to apply this standard to the facts as they appear on the record.

■ The Vice Chancellor ruled that Fred's "deceits" in delaying the appointment of new members and then secretly appointing persons from his immediate family as directors created "no legally cognizable harm" sufficient to justify equitable relief. Appellants complain that even though no financial loss is attributable to Fred's machinations, his actions placed the Foundation at risk and reflected disloyalty to the Foundation sufficient to justify his removal. We agree with the Vice Chancellor, however, that while Fred's conduct may have "harmed" the appellants' interests in continuing as directors of the Foundation, their legal entitlement to remain as directors was subject to Fred's authority to elect new members. Fred's deceit in concealing their replacement merely delayed the litigation which validated that result.

■ We also agree with the Vice Chancellor's determination that the appellants failed to prove that Fred's conduct created any financial harm to the beneficiaries of the trust, thus justifying his removal as a director. It should be noted, however, that the absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity. *Brophy v. Cities Service Co.*, Del.Ch., 70 A.2d 5, 7 (1949). Although Fred's secretive acts may have advanced his personal goals and had the potential for impairing the Foundation, as the Vice Chancellor noted, the broad power bestowed upon surviving members in the articles of incorporation created that risk. In the absence of proof that the Foundation suffered financial harm or that Fred benefitted financially from his conduct as a fiduciary, there is no basis for his removal.

Viewed objectively, Fred appears to have managed the Foundation, quite capably for the past twenty-three years. Under his direction, the value of Foundation assets has grown from $15 million to $195 million, while annual disbursements have grown from $200,000 to $8 million. It is true that some of this growth was due to Allan, Sr.'s bequest of Alleghany stock and that Fred relied heavily upon an undiversified portfolio of that stock during much of his tenure. Nevertheless, Alleghany's excellent performance during that period justifies Fred's reliance. Moreover, redemption of the Foundation's Alleghany stock has now enabled Fred to diversify its holdings, a move that will certainly place it on a more stable footing. As for the possibility that Fred might die and leave the Foundation in allegedly inexperienced hands, we consider this to be an inadequate basis for finding a threat to the Foundation's well-being. Certainly, Fred was under an obligation to bring new blood into the Foundation's management to insure informed continuity. Unless we were to hold that only professionally trained asset managers are equipped to serve the Foundation, there is no basis for challenging Fred's decision to entrust his own family with the future management of the Foundation.

■ In essence, the appellants' claim that Fred "entrenched" his family's control of the Foundation is simply a complaint that he treated his siblings unfairly. As the Vice Chancellor noted, Fred's actions may well be viewed as exhibiting "a lack of brotherly regard" but in his capacity as member and director of the Foundation, Fred owed no fiduciary duties to other directors, only to the Foundation. As long as his actions posed no threat to the Foundation, his status as member gave Fred the power to oust his siblings for any reason or even for no reason at all. *See* 8 *Del.C.* § 141(k).

■ In an effort to suggest that Fred indeed had a legal duty to treat his siblings with greater consideration, the Kirby plaintiffs rely heavily upon a letter written by Allan, Sr. in 1966 in which he expressed his wish that "members of our family down through the generations, will be interested in managing the Foundation." Although

we have no doubt that Allan, Sr. would have wished for Foundation involvement as well as harmony among his children, his letter and our own estimation of what he might have wanted have no legal significance. Had either the elder Fred Kirby or Allan, Sr. been intent on ensuring a place for all Kirbys in the Foundation, either could have drafted or amended the corporate documents to reflect that intention. If the Certificate were arguably ambiguous on this point, Allan, Sr.'s letter might serve as an aid in resolving that ambiguity. However, neither the certificate nor any original bylaw reflects an attempt to guarantee a place for any Kirby in the Foundation. Thus, we can view Allan, Sr.'s letter as no more than a legally insignificant expression of his hopes for the future.

### B.

 The appellants' charge that Fred acted illegally by serving as the Foundation's only member for eleven years is the most substantial of their claims. The Certificate clearly requires that there be at least three members at all times and that vacancies be filled "as soon as practicable." We find no merit in Fred's contention that he could not decide who was best qualified to serve the Foundation and therefore did not find it "practicable" to appoint new members. Given the mandatory language of the Certificate, eleven years was clearly too long to delay in performing his duty as the sole member.

Nevertheless, the time during which anyone could seek equitable redress for this violation has now passed. We believe that a timely action to compel Fred to appoint members would have been successful. However, since Fred has now validly appointed a full complement of members, this claim is moot. Moreover, although two individuals were deprived of the right to serve as Foundation members for eleven years, it is impossible to fashion any retrospective remedy since it cannot be said who Fred would have appointed if he had been compelled to do so. Since there is no evidence that Fred's failure to appoint new members posed any threat to the Founda-

tion, his inaction does not raise the question of his loyalty to the Foundation.

 Next, the appellants contend that Fred's failure to disclose his appointment of new members for a period of two years harmed the Foundation, arguing that it posed a threat to the validity of the Foundation's sales of its Alleghany stock and later of its American Express stock. They contend that both of these transactions constituted sales of substantially all of the Foundation's assets under 8 *Del.C.* § 271, and that as such, the full membership was required to approve them. It is argued that Fred's determination to deceive his siblings prevented him from seeking the required approval and laid the transactions open to legal challenge. We find, however, that the transactions did not involve sales of substantially all of the Foundation's assets. Although the magnitude of the transactions was unquestionably large, the rule announced in *Gimbel v. Signal Cos.*, Del.Ch., 316 A.2d 599 (1974), *aff'd*, Del.Supr., 316 A.2d 619 (1974), makes it clear that the need for shareholder (or member) approval is to be measured not by the size of a sale alone, but also by its qualitative effect upon the corporation. Thus, it is relevant to ask whether a transaction "is out of the ordinary and substantially affects the existence and purpose of the corporation...." *Id.* at 606. The Foundation is in the "business" of holding investment securities and donating its profits to charity. The exchange of one portfolio of securities for another portfolio of similar value does not substantially affect this corporate purpose. Accordingly, we find that member approval was not required and that Fred's failure to seek it did not taint the transaction.

 Next, the appellants allege that Fred falsified the minutes of the June 5, 1986 directors' meeting at which the Kirby plaintiffs enacted their bylaw amendment. As recorded, the minutes state that "[a] majority of directors ... insisted on voting on the proposed resolution but agreed to submit it to counsel for recommendations prior to deciding what to do about the inclusion of the resolution in the minutes at

the next Board of Directors meeting." The Kirby plaintiffs contend that they agreed to seek advice of counsel but that they did not make adoption of the resolution contingent upon counsel's approval. The Vice Chancellor made no specific finding as to what actually transpired at the meeting; however, he ruled that no cognizable harm occurred if the minutes had been falsified, and we agree. Under appropriate circumstances, the falsification of a corporation's minutes might constitute a breach of a director's duty of candor. Here, however, the appellants offered no evidence that anyone was or even could have been deceived by the alleged falsification or that the Foundation or its beneficiaries were harmed.

■ Finally, the Attorney General argues that Fred breached his fiduciary duty to the Foundation by directing that the shares of stock it held in various corporations be voted in favor of his election to the boards of directors of those corporations. As the defendants point out, Fred's election to these boards was at no point contested. Moreover, the Attorney General cites no authority to support his claim, and we know of no authority that would require a corporation to abstain from voting its shares as its directors choose, in the absence of some threat or harm to the corporation's interests.

In sum, we affirm the Vice Chancellor's determination that the appellants failed to prove a cognizable claim justifying Fred's removal. Fred did violate the terms of the Certificate by failing to appoint additional members for eleven years, but any claim arising from that failure has been mooted by his appointment of his wife and children. Thus, we find no basis for questioning the right of any of the defendants to continue serving in their present offices.

**13.** In so far as the Attorney General seeks to wrest control of the Foundation from the directors who approved the transaction, his appeal against the Kirby plaintiffs is mooted by our ruling that the Kirby plaintiffs are no longer directors. However, the Attorney General's intimations that the Foundation might try to seek damages from the directors who approved

## V

We turn now to the Attorney General's challenge to the fairness of the Foundation's sale of Alleghany stock. It is alleged that Kirbys stood on both sides of the Alleghany transaction and that the negotiated exchange was unfair to the Foundation and its beneficiaries. Because Fred and the Kirby plaintiffs approved this transaction as directors, the Attorney General directs this claim against all four directors. However, the Attorney General's complaint sought neither rescission of the transaction nor removal of directors. Rather, the Court of Chancery was requested to appoint independent directors to the Foundation in sufficient numbers to deprive the Kirby family of ultimate control. The Attorney General also asked that the Foundation be ordered to seek an investment bank's opinion of the fairness of the transaction, to enable the newly-appointed outside directors independently to evaluate the fairness of the transaction. At oral argument, the Attorney General suggested that the independent directors might then either ratify the transaction or reject it, and that if they rejected it, Fred and the Kirby plaintiffs might be liable to the Foundation for damages.[13]

Preliminarily, we note that the relief requested by the Attorney General appears to be inconsistent with his allegations of unfairness in the transaction and lack of fidelity by the fiduciaries who approved it. Apparently, the Attorney General is willing to permit allegedly unfaithful directors to remain in office, as long as their power is diminished by the appointment of outside directors. In addition, the Attorney General asked the Court of Chancery to declare the transaction unfair to the Foundation as a matter of law, but permit outside directors to declare it fair and ratify it on the basis of an investment bank's opinion.[14]

the transaction suggest that the Kirby plaintiffs still have a tangential interest in the outcome of this phase of the litigation.

**14.** A court will defer to the business judgment of outside directors that an interested transaction is fair to the corporation. 8 *Del.C.* § 144(a)(1). However, if a court were to de-

With these reservations concerning the appropriateness of the requested remedies, we examine the Court of Chancery's ruling upholding the fairness of the Alleghany exchange.

The Attorney General argues that the standards governing the decision of a nonstock, charitable corporation to engage in a transaction in which its directors have an interest are unsettled under Delaware law. It is true that our courts have never been called upon to examine directly the propriety of such a transaction. However, as noted in Part IV, *supra*, in *Dennckla* this Court stated that "the test as to the legality of action taken by the governing board of the [charitable] corporation is to be determined in accordance with principles of corporate law rather than the principles governing the fiduciary relationship between trustees of a technical trust and their trust." 193 A.2d at 541. Although the narrow question addressed in *Denckla* was the propriety of one charitable corporation's decision to convey part of its assets to a similar corporation, the broad language quoted above finds application to the questions now before us. *See also Stern v. Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries*, D.D.C., 381 F.Supp. 1003, 1013 (1974) ("modern trend" is to apply corporate law to charitable corporations). Nevertheless, the Attorney General takes the position that the Alleghany transaction should be judged under principles of trust law, rather than corporate law.

Under trust law, self-dealing on the part of a trustee is virtually prohibited. *Vredenburgh v. Jones*, Del.Ch., 349 A.2d 22, 33 (1975); *In re Thomas*, Del.Supr., 311 A.2d 112, 114 (1973). An interested transaction is not void but is voidable, and a court will uphold such a transaction against a beneficiary challenge only if the trustee can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms. *Vredenburgh*, 349 A.2d at 33. However, a court of equity has the

power to approve a transaction on behalf of the trust's beneficiaries if they are not *sui juris* and if it finds the transaction to be in their best interest. *See Equitable Trust Co. v. Gallagher*, Del.Supr., 102 A.2d 538, 545 (1954); *see also* Restatement (Second) of Trusts § 170 comment f (1959).

By contrast, the restrictions upon interested transactions by a stock corporation are less stringent. At common law, a corporation's stockholders did have the power to nullify an interested transaction, although considerations of the transaction's fairness appear to have played some part in judicial decisions applying this rule. *See, e.g., Potter v. Sanitary Co. of Am.*, Del.Ch., 194 A. 87 (1937); *see also Marciano v. Nakash*, Del.Supr., 535 A.2d 400, 403 (1987). The enactment of 8 *Del.C.* § 144 in 1967 limited the stockholders' power in two ways. First, section 144 allows a committee of disinterested directors to approve a transaction and bring it within the scope of the business judgment rule. Second, where an independent committee is not available, the stockholders may either ratify the transaction or challenge its fairness in a judicial forum, but they lack the power automatically to nullify it. When a challenge to fairness is raised, the directors carry the burden of "establishing ... [the transaction's] entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701, 710 (1983). If a transaction is found to be unfair to the corporation, the stockholders may then demand rescission of the transaction or, if that is impractical, the payment of rescissory damages. *Id.* at 714. If, however, the directors meet their burden of proving entire fairness, the transaction is protected from stockholder challenge.

The Attorney General argues that a charitable trust and a charitable corporation are created for the same purpose, and that to apply different standards to the two entities would elevate form over function. In this context, however, form is not an

---

clare a transaction unfair, there is no mechanism under Delaware law for allowing a new

slate of disinterested directors to gainsay the judgment of the court.

unimportant consideration. For example, a business enterprise may be established as either a corporation or a partnership, and the choice of form results in very different legal consequences. Similarly, the creator of a charitable enterprise recognizes that different legal rules govern the operation of charitable trusts and charitable corporations and selects a form with those rules in mind. The founder of a charitable trust binds its funds by the express limitations and conditions of the trust document and imposes upon its trustees the strict and unyielding principles of trust law. By contrast, the founder of a charitable corporation makes a gift "outright to the corporation to be used for its corporate purposes," *Denckla*, 193 A.2d at 541, and invokes the far more flexible and adaptable principles of corporate law. Both forms are fully recognized by our law and each has its function. One of the cardinal principles of trust law is that the intention of the settlor is paramount. Restatement (Second) of Trusts §§ 23–27. We believe that the decision of Fred M. Kirby to endow a corporation rather than a trust in 1931 is equally entitled to deference.[15]

Deciding that corporate, rather than trust principles should apply to the Foundation does not end our inquiry into the standards according to which the Alleghany transaction should be judged. 8 *Del.C.* § 144 is not, by its terms, directly applicable to a nonstock corporation. The language of the statute is directed to the power of stockholders to ratify or attack an interested transaction. Since a for-profit corporation is to be managed for the benefit of its stockholders, the statute sets out the conditions under which stockholders may assert that the directors have acted in their own interests rather those of the stockholders. The Foundation, however, must be managed on behalf of its beneficiaries, who are represented by the Attorney General. Since the statute does not address the roles of the beneficiaries or the Attorney General in challenging the conduct of the directors of charitable corporations, we cannot apply it directly to the Foundation. We find, however, that standards similar to those set forth in section 144 should govern the Foundation.

■■■■ The fact that some interested transactions are permitted under our corporate law demonstrates that they are not inherently detrimental to a corporation. As long as a given transaction is fair to the corporation, and no confidential relationship betrayed, it may not matter that certain corporate officers will profit as the result of it. The fact that a corporation is to be managed on behalf of charitable beneficiaries rather than stockholders does not alter the basic premise that interested transactions are not inherently wrong. The key to upholding an interested transaction is the approval of some neutral decision-making body. Under 8 *Del.C.* § 144, a transaction will be sheltered from shareholder challenge if approved by either a committee of independent directors, the shareholders, or the courts. We see no reason why independent directors and courts should not also have the power to evaluate the fairness of an interested transaction undertaken by a charitable corporation. As for the beneficiaries, who logically stand in the same position as the

---

**15.** Even under principles applicable to charitable trusts, it is not clear that the Attorney General could automatically void an interested transaction. As the Attorney General points out, even trust law allows a trust's beneficiaries to approve a tainted transaction. Because the beneficiaries of a charitable trust cannot be precisely identified, however, beneficiary approval cannot be obtained. That does not mean that an unreviewable power to approve or set aside tainted transactions by a charitable trust falls to the Attorney General. The Attorney General represents the beneficiaries but he is not himself a beneficiary. Moreover, as we have already noted, courts have an equitable power to approve interested trust transactions if the beneficiaries are not *sui juris* and if the transaction is in the beneficiary's best interests. *Equitable Trust,* 102 A.2d at 545; Restatement (Second) of Trusts § 170 comment f. Beneficiaries whose identity cannot be ascertained are unquestionably not *sui juris.* Thus, we believe that a challenge by the Attorney General to an interested transaction undertaken by a charitable trust would simply impose upon the trustees the burden of proving that the transaction was in the beneficiaries' best interests. This burden would not appear to be significantly different from the corporate directors' burden of proving entire fairness under *Weinberger.*

stockholders of a for-profit corporation, their interests must be represented by the Attorney General. The Attorney General holds the power and bears the duty of invoking the jurisdiction of the courts to evaluate the fairness of any interested transaction that has not been approved by an independent committee and that the Attorney General feels is detrimental to the charitable corporation. By failing to challenge a given transaction, the Attorney General would effectively ratify it on behalf of the beneficiaries.

The Attorney General argues that it is unfair to force the beneficiaries to rely upon "the inclination and budget of a public official to vindicate their rights." Attorney General's Opening Brief at 16. However, Delaware law unambiguously places the burden of protecting the interests of beneficiaries upon the Attorney General. *Wier v. Howard Hughes Medical Inst.*, 407 A.2d at 1057. Moreover, if we adopted the standard of conduct suggested by the Attorney General and barred all interested transactions by charitable corporations, the restriction could not be self-enforcing. The beneficiaries would still have to rely upon the "inclination" of the Attorney General to come forward and seek injunction or rescission of the tainted transaction.

■ In defending against the Attorney General's allegations, the Kirby plaintiffs argue that the Alleghany transaction did not really involve a conflict of interest.[16] Although Fred and Allan, Jr. served as directors of both the Foundation and Alleghany, the Kirby plaintiffs argue that they were not interested directors because they absented themselves from the Alleghany board meetings at which the transaction was approved and because they did not negotiate on behalf of either corporation. For our purposes, these facts are legally irrelevant. Although the approval of the transaction by Alleghany's disinterested directors shelters it from challenge by Alleghany stockholders, the fact remains that Fred and Allan, Jr. voted to approve the transaction as Foundation directors. Accordingly, they were in a position to approve a transaction that could favor Alleghany at the expense of the Foundation. The fact that they were on the Alleghany board conceivably gave them motive to do so. Similarly, the fact that the Foundation's attorney negotiated on its behalf did not affect the ultimate power of the Foundation's board to approve or reject the transaction.

■ The Kirby plaintiffs also argue that Grace and Ann were not interested directors because they merely owned stock in Alleghany. They then cite *Unocal* and several other cases for the proposition that a transaction does not "become an 'interested' director transaction merely because certain board members are large stockholders." 493 A.2d at 958. This language is quoted wholly out of context. *Unocal* held that a director's ownership of stock in his *own* corporation does not give rise to a conflict of interest unless the director somehow contrives to favor his own interests over those of other stockholders. All of the Foundation directors held large blocks of Alleghany stock, a fact that could have induced them to advance Alleghany's interests at the expense of the Foundation and its beneficiaries. Thus, the Alleghany transaction was unquestionably an "interested" transaction within the meaning of 8 *Del.C.* § 144 or any other analogous standard.

■ Because all four Foundation directors had an interest in the transaction, approval by an independent committee was not possible.[17] Thus, the Alleghany trans-

---

**16.** By contrast, Fred concedes a conflict and argues that the transaction was fair to the Foundation.

**17.** Because of the special duty of the fiduciaries of a charitable corporation to protect and advance its charitable purpose, the court's review of an independent committee's approval would be more searching for a charitable corporation than for a for-profit corporation. If disinterested directors approved a transaction that posed a clear threat to the charitable purpose or the assets of the corporation, their approval would be an *ultra vires* act and therefore not legally binding. Thus, even when an independent committee approved a transaction, the Attorney General would still have some leeway to challenge it. The extent to which the standard of

action presents a situation similar to that in *Marciano v. Nakash*, where "the sole forum for demonstrating intrinsic fairness ... [is] a judicial one." 535 A.2d at 404. The standard for intrinsic fairness is the searching test announced in *Weinberger*. The interested directors bear the burden of proving the entire fairness of the transaction in all its aspects, including both the fairness of the price and the fairness of the directors' dealings.[18]

■■■ Before we turn to the task of analyzing the Vice Chancellor's ruling under this standard, we must first address a procedural defect alleged by the Attorney General. Under *Weinberger*, the burden of proving fairness is placed upon the defendants. However, the Vice Chancellor dismissed the Attorney General's action before the defendants had presented any evidence "on the ground that upon the facts and the law the plaintiff has shown no right to relief." Chancery Court Rule 41(b). The Attorney General argues that the Vice Chancellor improperly required the Attorney General to prove that the transaction was unfair rather than requiring the directors to prove that it was fair.

From a procedural perspective, this argument has some merit. The Vice Chancellor did state in his bench ruling that "there has been a complete failure of proof on the part of the Attorney General." Nevertheless, when the entire ruling is examined, it is apparent that the Vice Chancellor fully examined the fairness of the Alleghany transaction and ruled that it was fundamentally fair to the Foundation. For example, the Vice Chancellor stated that "the uncontradicted evidence indicates that ... the Foundation received a higher amount than it would have realized by pursuing the available alternatives." Thus, he clearly ruled that the negotiated price of the Alleghany stock was fair, rather than that the Attorney General had failed to prove that it was unfair. Elsewhere, he ruled that the negotiations between the Foundation and Alleghany were at arm's length and that the Foundation suffered no untoward tax consequences as the result of the sale. In short, his factual findings were consistent with a decision to dismiss the Attorney General's claim after a full review of all the evidence touching upon the fairness issue. The directors could meet their burden only if the transaction was fair, and the Vice Chancellor found that it was.

It is true that the directors never had the opportunity to introduce evidence as part of their case. However, the Attorney General presented a comprehensive portrait of the Alleghany transaction and called all relevant parties as witnesses. The directors had the opportunity fully to cross-examine these witnesses. By moving for dismissal under Rule 41(b), the directors were informing the court that they had nothing more to add, that the Attorney General had presented an extensive body of evidence that would allow the Vice Chancellor to rule on the merits. The Vice Chancellor's finding that the transaction was fair was essentially a finding that the

review applicable to an independent committee's approval would differ from the standard of entire fairness applicable to the decisions of interested directors is a question that is not now before us. At very least, the burden of proof would rest upon the Attorney General rather than the directors in such a case.

18. The *Weinberger* test is usually applied when stockholders seek rescission of a transaction or the payment of rescissory damages. Here, the Attorney General has never sought rescission and intimated for the first time at oral argument that rescissory damages might be sought. As the Attorney General has framed his request for relief, the true issue is whether the Kirbys are qualified to control the Foundation.

In the context of a for-profit corporation, it seems doubtful that *Weinberger* would ever be

used to remove or limit the power of interested directors who approved an unfair transaction. Although *Weinberger* recognizes "the Chancellor's powers ... to fashion any form of equitable and monetary relief as may be appropriate," 457 A.2d at 714, the stockholders should generally be recognized as the ultimate arbiters of whether directors are qualified to serve. 8 *Del.C.* § 141(k). When a charitable corporation is involved, however, our courts clearly have the power and the duty to remove a faithless fiduciary from office, particularly if the individuals responsible for electing that fiduciary are closely affiliated with him or are themselves tainted. Although perhaps not dispositive, the fact that a charitable fiduciary approved a transaction that was unfair under *Weinberger* would seriously call into question his fitness to remain in office.

Attorney General had carried the directors' burden of proof for them, by offering evidence that was uniformly consistent with a finding of fairness. While it is not the usual pattern, there is no prohibition against one party relying upon evidence introduced by his opponent to meet his burden of proof.

■ Having established that the Vice Chancellor did not err procedurally in granting the directors' Rule 41(b) motion, we must now consider the correctness of his ruling that the transaction was, in fact, fair to the Foundation. Under *Weinberger*, the first element of intrinsic fairness is fair dealing. The Vice Chancellor found that negotiations between Alleghany and the Foundation were "lengthy, vigorous and arm's length." We agree.

Although the Foundation's representative in its negotiations with Alleghany, Harry Weyher, was not instructed to seek alternatives to a deal with Alleghany, he was given full authority to seek the best possible price for the Foundation. The directors did not attempt to impose upon Weyher any preconceived notions of what the outcome of the negotiations should be. Nevertheless, the Attorney General criticizes the directors' failure vigorously to explore alternative transactions. He argues that this failure is evidence of the directors' dogged insistence on concluding a deal with Alleghany. Because a deal with Alleghany was inevitable, the Attorney General argues, a course of fair dealing during the negotiations was impossible.

In *Barkan v. Amsted Indus., Inc.*, Del. Supr., 567 A.2d 1279 (1989), we evaluated the propriety of a board's decision to approve a management-sponsored leveraged buyout of their corporation without actively seeking alternate buyers. We held that the key to an adequate evaluation of the fairness of a transaction is reliable and complete information. Thus, "[w]hen ... the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market." *Id.* at 1287. We find that several factors supported the

decision of the Foundation's directors not to seek alternatives to Alleghany transaction.

The Attorney General concedes that I.R.C. § 4943 imposed an obligation upon the Foundation to sell its stock to *someone*. If the Foundation had eschewed the Alleghany transaction, it could have sold its shares either on the market or through a private placement. However, because the Foundation was an "affiliate" of Alleghany, it would have had to register the stock under the Securities Act of 1933 prior to a sale on the open market. The transaction costs associated with registration can be quite high. Moreover, because the amount of Alleghany stock trading on the open market—about two-and-a-half to three million shares—was small relative to the block held by the Foundation, a sudden public sale would depress the market price. This effect might have been ameliorated if the Foundation had made several small sales of the course of a few years, but the need for registration would have remained. On the other hand, if the Foundation had sought to avoid registration through a private placement, it would have had to comply with SEC Rule 144, 17 C.F.R. § 230.144, which would bar resale by the buyer for a period of two years. As a result, any buyer would have demanded a significant discount below market to compensate for this reduced liquidity.

The Attorney General makes little effort to suggest that alternatives to the Alleghany transaction did not suffer from these defects. He merely cites a 1981 transaction in which Alleghany paid a premium for a large block of stock that it repurchased from an individual named Jacob Kaplan. He then argues that the Foundation's block of shares could have commanded a similar premium due to its size. We fail to see the logic of this argument. A large block of stock will carry a premium if its size gives its owner some special advantage. Thus, if a block is large enough to give a buyer control of corporation, the stock will command a "control premium." If, as appears to have been the case with the Kaplan stock, a corporation's directors believe that

a large stockholder poses a threat to the corporation, the corporation may pay a premium to eliminate that threat. *See Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964). On the other hand, if a large block has no special value, its size will depress the market price. It is a basic law of economics that the price of any commodity falls when its supply increases dramatically.

We find that the obvious drawbacks attached to other possible alternatives to the Alleghany transaction justified the directors' decision not to explore alternative transactions. This does not mean, of course, that the Foundation was free to sell at any price. Weyher remained under a duty to negotiate vigorously on the directors behalf and the directors were under a duty to approve a price that was fair. If Alleghany's offers had proven to be less than the price that was likely to obtain in alternative transactions, the Foundation would have been forced to look elsewhere. With these considerations in mind, we find that both the negotiations and the final price were fair to Alleghany.

Weyher and Alleghany's representative, Merrill Lynch, negotiated for over a month. Merrill Lynch correctly pointed out that the Foundation's need to sell, together with the lack of good alternative transactions, left the Foundation with little bargaining power. Weyher countered that the tax advantages that Alleghany stood to gain by redeeming the Foundation's stock made it unlikely that Alleghany would ever break off negotiations. Thus, Weyher actively sought to extract a premium from Alleghany, while Merrill Lynch demanded a discount. The record shows that Weyher continued to demand a premium, notwithstanding Merrill Lynch's insistence that it had no authority from Alleghany to purchase except at a discount. Finally, after seeking new authority from Alleghany, Merrill Lynch offered to buy the Foundation's stock at market prices, an offer that Weyher and the directors ultimately accepted. Thus, the record reflects that Weyher negotiated vigorously on behalf of the Foundation and managed to extract important concessions from the initially intractable Alleghany representatives. His actions

were fully in keeping with the most exacting standards of fair dealing.

We now turn to the fairness of price, the second element of entire fairness under *Weinberger.* In this context, the most economically meaningful way of judging fairness is to compare the price paid with the price that was likely to be available in alternative transactions. As we have already noted, all possible alternatives were seriously flawed. If the Foundation had sold to any buyer other than Alleghany, it would have undoubtedly sold at a discount.

The Attorney General emphasizes the $26 million of tax savings that Alleghany gained from the transaction. He argues that a fair price would have taken account of these savings and made a portion of them available to the Foundation in the form of a premium. We find no merit in this contention. Although the Attorney General seems to imply that Alleghany's tax savings were somehow gained through subterfuge, Alleghany has simply taken advantage of the clear and unambiguous terms of the tax code. By enacting I.R.C. § 311(d)(2)(D), Congress intended to encourage precisely the type of transaction that Alleghany and the Foundation entered into. The code provision reflected Congress' judgment that corporations should be encouraged to redeem large blocks of their stock held by private foundations. Congress could have made similar tax benefits available to foundations, but did not. Thus, any tax savings to be garnered through a stock redemption belonged solely to Alleghany. The Foundation had no means of sharing in these benefits; if Alleghany had refused to deal with the Foundation, the benefits would have disappeared and the Foundation would have been left to seek out the next best alternative. In the final analysis, the fairness of the price that the Foundation received for its Alleghany stock must be judged by the value of that stock in the Foundation's hands, not in Alleghany's hands. The Foundation had to sell, and alternatives to the Alleghany transaction all involved selling at a discount. Any price higher than that avail-

able in the next best alternative must be considered fair.

Of course, the Foundation could, and did, encourage Alleghany to pay more than the discounted price available in a public offering or private placement. The Foundation had some bargaining power because Alleghany was reluctant to abandon its potential tax savings. Thus, to the extent that the Foundation received a price higher than the next best price, it did exactly what the Attorney General argues it should have done: it convinced Alleghany to pay more than it had originally intended. Since the market price exchange that the parties eventually agreed to was higher than the next best price, it was clearly fair to the Foundation.

The Attorney General also alleges that the Foundation was forced to pay an excessive tax on the transaction; he points out that while Alleghany could deduct $25 million, the Foundation incurred a $1.5 million tax bill on its $75 million gain. First, it should be pointed out that I.R.C. § 4940 imposes a flat two-percent tax on a foundation's investment income gains. Thus, there was no way for the Foundation to avoid paying tax on any sale of Alleghany stock. Nevertheless, the Attorney General argues that the Foundation was harmed by incurring such a large tax bill in one year; he contends that the Foundation would have been better served if it sold its stock gradually. The force of this argument eludes us. If the Foundation had started selling its stock earlier, it undoubtedly would have been selling at a lower price, since the market price of Alleghany stock rose steadily from approximately $45 per share in 1981 to about $77 per share in 1985. As the Vice Chancellor pointed out, the Foundation would have saved "two cents for every dollar of profit lost."

The Attorney General also argues that the purchase price of the Alleghany stock should have reflected the Foundation's tax bill. By this, we presume that the Attorney General believes that Alleghany should have absorbed the Foundation's $1.5 million tax bill. However, as we have already established, the market price itself was in excess of the value of the stock in any alternative transaction. By paying what amounts to a premium above the next best price, Alleghany was in fact helping the Foundation to cover its tax bill.

Finally, the Attorney General argues that the Foundation should have sought an investment bank's opinion of the fairness of the transaction. Although Delaware law requires that corporate directors evaluate the propriety of a given transaction on the basis of a full complement of information, it does not require that they seek a formal fairness opinion. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 881 (1985). In some situations, a formal opinion may be helpful; in others, it will not significantly amplify the information already available to directors. Here, we have found that the Foundation's directors were correct in concluding that alternatives to the Alleghany transaction were flawed. At best, a fairness opinion might have made precise estimates of the discounted price that the Foundation would have received in various alternative transactions; we do not believe that it would have affected the basic conclusion that the Alleghany deal was the best available option. In light of the high cost of a fairness opinion, we do not believe that the directors erred in failing to seek one.

For the foregoing reasons, we find that the Vice Chancellor correctly determined that the Alleghany transaction was intrinsically fair. In making that determination, he was entitled to rely upon evidence introduced by the Attorney General, even though the burden of proving fairness rested upon the directors. Accordingly, we find that the Attorney General is entitled to seek no relief on behalf of the Foundation's beneficiaries.

## VI

In conclusion, we find that the trial court's decision to dismiss was correct. In addition, we have made an effort to clarify the standards according to which the conduct of the fiduciaries of a nonstock charitable corporation should be judged. Although principles of corporate law general-

ly govern the activities of such a corporation, its fiduciaries have a special duty to advance its charitable goals and protect its assets. However, a charitable corporation is not barred from engaging in transactions in which its directors have an interest, as long as such transactions are intrinsically fair or are approved by a committee of independent directors. Because the ruling of the Court of Chancery is in conformity with these principles, it is AFFIRMED.