EQUITABLE TRUST COMPANY, a corporation of the State of Delaware, Executor under the last will and testament of Margaret C. Kane, deceased,

Plaintiff below Appellant,

*vs.*

HUGH F. GALLAGHER, Defendant below Appellee.

*Supreme Court, On Appeal, February 5, 1954.*

SOUTHERLAND, Chief Justice, and WOLCOTT and TUNNELL, Justices, sitting.

*Stephen E. Hamilton, Jr.,* and *H. Albert Young,* Wilmington, for appellant.

*Joseph Donald Craven,* Wilmington, and, on the reargument, *Edwin D. Steel, Jr.,* of Morris, Steel, Nichols & Arsht, Wilmington, for appellee.

*David F. Anderson,* of Berl, Potter and Anderson, Wilmington, for J. Harry Gallagher, Hugh F. Gallagher, Jr., and Donald J. Gallagher, *amici curiae* in respect to the reargument.

TUNNELL, Justice, delivering the opinion of the court:

This is an opinion following reargument. Our former opinion, reported in — *Del.Ch.* —, 99 *A.2d* 490, contains a statement of the facts of the case and a review of the meandering course of this litigation, so we shall not repeat them here.

Defendant's several contentions are divisible into three principal classifications: (1) that our decision recognizes as consideration something which the record does not factually establish and which could not be established without violating the parol evidence rule; (2) that the opinion overrides certain adequately supported findings of fact of the lower court and the "law of the case" as previously settled in this court; and (3) that it accords legal force to an illegal contract. The most thorough manner in which these matters have been presented on reargument deserves their consideration in detail.

It is necessary first to re-examine our vital factual finding that Miss Kane orally obligated herself to surrender her life interest in 19 shares of Union Park Motors stock, releasing defendant from his trusteeship, in exchange for an absolute title to the same quantity of shares.

If we had no thoughts in the matter in addition to those we formerly expressed, it would, nevertheless, be quite impossible for us to escape the conclusion that the 1946 transaction was an attempted contractual substitution for the 1941 arrangement. The defendant's admissions—in the pleadings and deposition—and the statements of his trial counsel on the record preclude any other result and, since all these were quoted in the first opinion, there is no need to repeat them here.

But in our previous opinion we left much unsaid. Indeed, since we have restudied the record and reheard the arguments, we are now convinced that we were wrong in holding as we did that Miss Kane's promise was only oral. It was at least oral, but it may very well have been a part of the paperwriting, and there is no good reason why we should have excluded that possibility.

This instrument was drawn by an attorney. It was to be, and was, signed by Miss Kane. Why, if she promised nothing? The draftsman of the contract was representing the defendant, and since the obligations of defendant were spelled out in detail, and executed under seal, does it not seem strange that the paperwriting would altogether omit a statement of the obligation of the other party? Further, the draftsman was the same individual who filed the defendant's

answer, in which it is expressly acknowledged that the 1946 instrument was "meant to take the place of" the 1941 agreement.

By far the most eloquent fact, however, is defendant's course of conduct. Some time after Miss Kane's death, he got possession of all existing copies of this agreement and, although he denies the testimony that her mother vainly tried to persuade him to return Miss Kane's copy, he did not in fact return it, but proceeded to destroy *all* copies. He knew that the Kanes were under the impression that it conferred rights upon Miss Kane's estate. His explanation was that he destroyed these papers because he himself knew that the agreement was not enforceable after her death, and that he did not do so until after he had obtained legal advice as to its binding force, and even then not until someone had told him—falsely as it turned out—that the Equitable Trust Company was not going to serve as executor. In such a situation, of course, the normal reaction would have been to preserve the evidence in order to establish the supposed defense. The explanation—wholly lacking in logic—is almost as illuminating as the act of destruction itself. Both strongly suggest that the agreement was binding.

It is the duty of a court, in such a case of wilful destruction of evidence, to adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit. The maxim is that everything will be presumed against the despoiler. *Armory v. Delamirie,* 1 *Strange* 505, 93 *Eng.Rep.* 664; *Hudson v. Hudson,* 287 *Ill.* 286, 122 *N.E.* 497; 54 *C.J.S., Lost Instruments,* § 13, *page* 816. *Wigmore on Evidence,* (3d Ed.) *Vol.* II, *Sec.* 291, *at page* 186, indicates preference for a rule of the strongest import:

> "The truth is that there is no reason why the utmost inference logically possible should not be allowable, namely, that the contents of the document (when desired by the opponent) *are* what he alleges them to be, or (when naturally a part of the possessor's case) *are not* what he alleges them to be."

This attitude of the law is in truth no more than the application of a rule of common sense, based upon the characteristics normally found in human nature.

We find that we need not, and we do not, resolve the question as to whether Miss Kane's promise was oral or written. But these strong inferences that it was actually in the writing, as well as the presumption of the law in a case of spoliation, perforce support our finding that it was somewhere in the transaction. Of that we can have no doubt, and to that extent our former conclusion is reaffirmed.

The more serious question is whether or not the law will enforce that which the parties undoubtedly sought to do, but which the defendant, upon Miss Kane's death, sought to undo.

Attacking the legality of the consideration, defendant first invokes the parol evidence rule. He points out that in our former opinion we flatly stated that Chancellor Harrington's reconstructed paraphrase of the instrument was "couched in donative language" [— Del.Ch. —, 99 A.2d 492] and set forth "no supporting consideration"; yet, he says, we then proceeded to rely upon extraneous evidence that there was consideration. What the court did, therefore, says defendant, was to change an unenforceable gift into a binding bargain. Acknowledging the propriety of admitting parol evidence to amplify a recital of consideration, defendant says, however, that it cannot be done in any case where the result would be to "vary or contradict the legal effect of the deed", citing, *Florida Moss Products Co. v. City of Leesburg*, 93 *Fla.* 656, 112 *So.* 572, 574; *Wood v. Moriarty*, 15 *R.I.* 518, 9 *A.* 427, 428; and like cases. Since we have stopped short of a finding that Miss Kane's promise was actually in the paperwriting, this argument, therefore, commands attention.

There can be no doubt of the force and value of the parol evidence rule in those cases to which it applies. It operates to prevent a party from reducing the fee simple plainly described in a deed to a defeasible fee;[1] to prevent proof that the scope of the land conveyed was less than that clearly called for in the deed;[2] to prevent a showing that an agreement was not to be enforced against one of the signatories;[3] or otherwise to prevent a person from talking the substance out of what he has put into writing.

1. *Scott v. McGill*, 245 *Ala.* 256, 16 *So.2d* 866.
2. *Elder v. Elder*, 10 *Me.* 80, 25 *Am.Dec.* 205.
3. *Wadsworth v. Warren*, 12 *Wall.* 307, 20 *L.Ed.* 402.

Experience, however, produces a multitude of instances in which, without a relaxation of the parol evidence rule to let in accompanying oral covenants, perfectly sound agreements, entered into by both parties in good faith, would be defeated by a legal technicality. Hence, from the very inception of the practice of reporting decisions of the courts, it has consistently been held that parol evidence can be let in to prove that there was consideration for a deed, even though the deed may contain no mention of any consideration, and consequently may appear, so far as the text of the instrument is concerned, to effect a gift. *Negus v. Reynal,* 1 *Keb.* 12, 83 *Eng.Rep.* 780; *Henry Harpur's Case,* 11 *Co.* 24, 77 *Eng.Rep.* 1173 (1176); *Hartley's Lessee v. McAnulty,* 4 *Yeates, (Pa.)* 95, 2 *Am.Dec.* 396; *Greenleaf on Evidence,* (13th Ed.) *Vol.* I, *Sec.* 304, *p.* 363. Nor has this wholesome principle lost any of its vigor with the passing of the years. See *Restatement of Contracts, Sec.* 240(2).

This is just such a case unless, as defendant urges, the statement that the stock "is given" or "was being given" alone bars the conclusion that the relationship was contractual in nature.

Putting aside any question as to whether this terse reconstruction of a lawyer's language, captured from the recollection of lay witnesses, is any proper basis for semantics, and assuming, *arguendo,* that the verb "give" was actually used in the original paper, still no real contradiction is involved. "How much will you give me?" in the idiom of the day, is frequently the precise equivalent of "How much will you pay me?" and the entirely unexplained choice between these two expressions is no fit criterion upon which to determine important legal consequences.

We find, therefore, that our decision does not violate the parol evidence rule.

Defendant next says that because Miss Kane signed this paper in September and never either "performed or tendered performance of her promise" prior to her death in the January following, and because her death, of course, destroyed the value of the life interest she was to surrender, therefore, there was a total failure of consideration, and defendant's obligation expired when Miss Kane

died. He cites *Restatement of Contracts, Secs.* 281, 282, and *Merritt & Co. v. Layton,* 1 *Boyce* 212, 75 *A.* 795.

If we were to follow defendant's example and place emphasis upon the precise phraseology of the reconstructed form of the contract, this would be a case of the voluntary assumption of risk immediately upon execution of the contract. The statement that Margaret C. Kane "is given" or "was being given" [4] 19 shares would thus be an express timing of the equitable transfer. *Corbin on Contracts, Vol. 6, Sec.* 1354.

We do find that this risk fell upon defendant, but we rest our conclusion upon a ground somewhat broader than the tense of a verb which was quoted in paraphrase from memory. Let us briefly analyze defendant's argument. It is frankly grounded upon the theory that since no time for settlement was named in the contract, the obligations of the opposing parties were "concurrent"; it was Miss Kane's duty to go forward just as much as it was defendant's; and, since she did not see fit to do so in time to do the defendant any good, her estate will not be permitted to force the transaction through to completion now.

In a proper case this reasoning has syllogistic force. *Williston on Contracts, Vol.* 3, *Sec.* 835. Under this court's view of the transaction, however, there is a flaw in the premise.

It was defendant's first move. Exactly what Miss Kane was to do would not be settled so long as it was uncertain what shares she was to get. If defendant could obtain a release of the remainder rights of his sons, there would never be anything for Miss Kane to do except to receive the certificate after it had been duly assigned by the trustee and the remaindermen. On the other hand, if the shares were to be other shares, Miss Kane would need to assign her rights in these. That, of course, could be accomplished by a separate instrument, but the more ordinary procedure would be merely to put the assignment on the back of the certificate. Here again, the certificate covering the rights thus to be assigned was in the name and custody of the trustee.

4. Obviously not the original language.

It was presumed to be in his exclusive possession. An ordinary businessman in the same circumstances would either merely wait, or he would demand performance; he would not "perform" or "tender performance".

So far as we now know, all Miss Kane did was to wait. There is no suggestion of any form of waiver. To the contrary, as of December 31, 1946, she received the dividend on 20 shares [5] of this stock, by check payable directly to her, in precisely the same way as it would have been paid if the transfer had already been completed.

At any time prior to Miss Kane's death she could have filed such a suit as this, with or without prior demand. *Williston on Contracts, Vol. 3, Sec.* 834. Her early death made the bargain a poor one from the defendant's point of view, but it was still a bargain, and her estate is entitled to have it enforced.

Defendant next urges that in our former opinion we overruled Chancellor Harrington on a disputed question of fact and at the same time departed from the "law of the case". This criticism is directed in particular to this portion of our language:

> "We are not here concerned with any problem similar to the one which troubled the Chancellor on the gift question, as to whether this was an attempt to deal a second time with the same 19 shares which had already been given away." [— *Del.Ch.* —, 99 *A.2d* 494.]

Defendant says that the Chancellor found that the 1946 agreement referred to the same shares as the 1941 agreement, and that this court as formerly constituted expressly affirmed that finding. The Vice Chancellor understood himself to be very closely limited by those two rulings. See his memorandum opinion of the 12th day of May, 1953. Yet, defendant says, this court accorded them scarcely a passing nod.

This contention of defendant is rested upon various quotations from the opinions of our predecessors, of which two will serve as

---

5. It will be remembered that since 1936 she had owned one share in fee.

well as several. First, in the first opinion of the former Supreme Court, in speaking of plaintiff's gift theory, Judge Layton said: [6]

> "The Chancellor further found, and the evidence justified his conclusion, that by the 1946 agreement Gallagher was attempting to change the 1941 trust to the extent of disposing of the same 19 shares in fee instead of for life * * *."

Later in the same opinion, in reference to the contract theory, he went on to say:

> "And the 1946 agreement having reference to the same 19 shares constituting the corpus of the 1941 trust, it is Appellant's position that deceased would have assigned her life estate in these shares under the former, in consideration for an outright transfer in fee of 19 additional shares under the latter agreement. But the Chancellor did not consider this phase of the case * * *."

The excessive brevity of our former treatment of this whole matter apparently resulted in obscurity. Far from departing from the findings of our predecessors on this bench, however, we consider that we simply followed along the way to which they had pointed. Judge Layton spoke of the possibility of an obligation to transfer 19 "additional shares".[7] This was the Supreme Court's statement of the very point to be settled when the case was eventually remanded.

Defendant has confused a finding that the contract anticipated transfer of a particular lot of 19 shares with a holding that defendant's obligation to respond was restricted to those shares. There is in this connection a very real difference between the legal position of a donor and that of a contractor. If a man purports to give away what he doesn't have, the gift simply fails. Not so with a contract. If a man contracts to sell what he doesn't have, he must

---

6. 32 *Del.Ch.* 401, 77 *A.2d* 548, 549.

7. We take this expression to bear upon the point here under discussion, but we do not take it to indicate a choice against appellant's alternative prayer for money damages, as later considered. This is only a statement of appellant's "position" under the contract theory, and appellant has never abandoned either of its alternative prayers.

nevertheless come up with what he promised to convey or answer in damages. *Deputy & Co. v. Hastings,* 2 *W.W.Harr.* 345, 350, 123 *A.* 33; *Stabler v. Ramsay,* 33 *Del.Ch.* 1, 89 *A.2d* 544.

This brings us to defendant's contention that the agreement as we construe it is illegal because it requires a trustee (here defendant) to bargain for his own profit with his *cestuis* (his sons). It is not denied that one who agrees to obtain the consent of a third person may ordinarily be held liable for failure to do so. But defendant flatly says that if the contract contemplated that defendant would attempt to acquire from his sons the remainder interests which were designed to pass to his sons upon the termination of the father's trusteeship, the contract is for that reason illegal and void, and since the parties are said to be *in pari delicto,* the law will leave them where it found them, citing *inter alia, Restatement of Trusts, Sec.* 170(1), *Comment j;* 6 *Williston on Contracts, Sec.* 1737; and *Morford v. Bellanca Aircraft Corporation,* 6 *Terry* 129, 67 *A.2d* 542, 547.

■■■■■■ The foregoing paragraph is not supported by the citations it contains and does not state the law. A trustee is permitted to acquire from his beneficiary a conveyance or release of interests in the corpus of the trust, provided that the beneficiary is *sui juris* or, if not, that the appropriate court gives approval, and provided that the trustee in his dealings is candid to the high degree required in such confidential relationships, and further provided that the transaction is in fact fair and reasonable. *Restatement of Trusts, Sec.* 171(2) and *Sec.* 216; *Scott on Trusts, Vol.* 2, *Sec.* 170.1 and *Vol.* 3, *Sec.* 343; *Bogert, Trusts and Trustees, Vol.* 3, *Part* I, *Sec.* 485, *p.* 113. An undertaking by a trustee to buy or otherwise deal in trust property for his own benefit is therefore not illegal *per se;* its legality or illegality depends on the circumstances attending the consummation of the transaction. One method of proceeding, as above stated, is to obtain the approval of the Court of Chancery. See *Gerhard and Delaware Trust Co. v. Woodriff,* Court of Chancery, New Castle County, 1943, Rec. D 4-477, 479, 482. Hence Gallagher's agreement to obtain the release of the trust *res* did not, as defendant argues, necessarily contemplate anything wrongful.

Certainly there has been no showing here of any intent on the part of defendant to deal in bad faith with the remaindermen. Moreover, it is to be noted that they are defendant's sons, that they are *sui juris,* and that they probably know something about the value of Union Park Motors stock, since at all times with which we are concerned all three of them were officers of the corporation.

Clearly the "breach of trust" argument lacks merit.

Defendant finally urges that our opinion is wrong in depriving defendant of 38 shares, when it was intended that he should be out to the extent of only 19.

If defendant did in fact hope to vest 19 shares in Miss Kane absolutely, yet to leave his sons owning a remainder interest in 19, and still in the process to divest himself of only 19 shares altogether, then he must have been confused. More likely, he believed that he could come to a fair agreement with his sons.

Whatever be the reason for Gallagher's course of action, there is no basis for supposing that this gift to defendant's sons is anything which Miss Kane either initiated or took it upon herself to extinguish. It appears to be wholly outside the scope of her bargain, and there is no reason to charge her with it. Whether the sons would, or will yet, refuse assent to any agreement proposed by their father appears to be a matter of concern to no one outside the Gallagher family, and we accord it no materiality.

The complaint prays for relief in the alternative, for 19 shares of Union Park stock or for their equivalent in money, in either case with an accounting for dividends. We closed our former opinion with the announcement that the form of relief would be settled in the Court of Chancery. That was because at that time there had been no argument before us as between the alternatives. Upon granting reargument, however, in view of the delay which a reargument would necessarily entail, we requested counsel to answer the basic question as to whether this action is in equity because the rights involved are of a distinctly equitable nature, or whether, on the other hand, this would be an ordinary suit at law but for the defendant's destruction

of the contract instrument. This point now has been adequately presented, and, in the interest of saving the time and effort of all concerned, we here state our views upon the nature of Chancery jurisdiction in the premises and the bearing of that conclusion upon the choice of an appropriate form of relief.

Defendant took our query about the jurisdiction to be an opening to question the existence of any equity jurisdiction at all, thus reverting to the position he had at one time taken before Vice Chancellor Seitz on a motion to dismiss the complaint. 30 *Del.Ch.* 291, 59 *A.2d* 454, 456. In denying that motion, the learned judge, *inter alia,* said:

> "Certainly for purposes of determining this motion to dismiss, the court may fairly say that the allegations of the complaint show that the defendant fraudulently procured and destroyed the copy of the agreement belonging to the deceased. The allegations also show that the defendant destroyed all copies of the agreement evidencing the rights of the deceased, and thereby deprived the executor of exact knowledge as to its rights thereunder. In such a case, this court has jurisdiction. In 3 *Pomeroy's Equity Jurisprudence (Fifth Edition)* § 919e, it is stated:

> "'Suppressing instruments: Conversely, when instruments have been fraudulently suppressed or destroyed for the purpose of hindering or defeating the rights of others, equity has jurisdiction to give appropriate relief by establishing the estate or rights of the defrauded party.'

> "(1) Thus, it is clear that this court has jurisdiction in this situation, and the fact that plaintiff's ultimate relief may be purely monetary does not alter this conclusion."

Now that the case has been tried, defendant urges that the proof failed to establish that defendant "fraudulently procured" Miss Kane's copy of the paper. The evidence on the point left some room for uncertainty, and there is no express finding on it in the record. Therefore, defendant reasons, since the Vice Chancellor's conclusion at the pleading stage was based upon a compound hypothesis, of which one element ultimately failed to materialize, it now becomes necessary to revise the conclusion.

We do not agree. It is true that the Vice Chancellor spoke of fraudulent procurement *and* destruction, but the linking of the two words appears to us to have been no more than an adaptation of the language of the court to the breadth of the particular pleadings. The authority he cited certainly holds that an act of spoliation, when committed for the purpose of hindering or defeating the rights of others, is a basis for concurrent jurisdiction in equity. It is a form of fraud and stands as one of the traditional heads of equity jurisdiction. *The King and Lord Hunsdon v. Countess Dowager of Arundel, Hob.* 109, 80 *Eng.Rep.* 258 (1616). In the case of *Tucker v. Phipps* (1746), 3 *Atk.* 359, 26 *Eng.Rep.* 1008, Lord Hardwicke said this:

> "As to the *spoliation,* consider it generally as a personal legacy, where the will is destroyed or concealed by the executor, and I think, in such a case, if the *spoliation* is proved plainly (though the general rule is to cite the executor into the ecclesiastical court) the legatee may properly come here for a decree upon the head of *spoliation* and *suppression.*

> "There are several cases, where if *spoliation* or *suppression* are proved, it will change the jurisdiction and give this court a jurisdiction which it had not originally; as in the case of Lord Hundson, Hob. 109, where the title was a title merely at law, yet there being a suppression of the deeds under which that title accrued, the plaintiff had a decree here for possession, and quiet enjoyment."

In our judgment the wilful destruction of at least three signed copies of this instrument affords abundant support for the view that it was done to defeat or hinder the rights of others, and such a finding in support of jurisdiction is implicit in the action of the former members of this court in remitting the case to the Court of Chancery for resolution of the contract issue.

It is elementary that the remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice. The subject of this particular contract was a small minority interest in defendant's family corporation. As defendant himself persuasively

argues, since the 19 shares do not represent corporate control, and there is nothing in the record to indicate that they possess any unique value for plaintiff, this is not properly a specific performance case. *Diamond State Iron Co. v. Todd,* 6 *Del.Ch.* 163, 14 A. 27, affirmed 8 *Houst.* 372, 14 *A. 27; Francis v. Medill,* 16 *Del.Ch.* 129, 141 *A. 697.* We conclude that there is no necessity for a judgment requiring defendant to respond out of his ample holdings of Union Park stock. Money damages are practicable and will suffice.

In accordance with the foregoing views, we must reverse the judgment appealed from in No. 17, 1953, and return the case to the Court of Chancery for the assessment of damages. Appeals No. 1, February Term, 1950, and No. 18, 1953, respectively, having become moot, will be dismissed.