# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BARBARA THOMPSON, individually, as Co-Successor Trustee of the Revocable Trust of Ralph W. Barrow dated June 3, 1992, and as Co-Executrix of the Estate of Ralph W. Barrow, deceased, | ) ) ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | C.A. No. 2023-0410-LM (MTZ) |
| WILLIAM E. BARROW, individually, as Agent of Ralph W. Barrow, as Co-Trustee of the Revocable Trust of Ralph W. Barrow dated June 3, 1992, and as Co-Executor of the Estate of Ralph W. Barrow, deceased, | ) ) ) ) ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 19, 2025
Date Decided: September 26, 2025

Timothy S. Ferry, Timothy R. Akers, Jr., FERRY JOSEPH, P.A., Wilmington, Delaware, *Attorneys for Petitioner Barbara Thompson.*

Charles J. Durante, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, *Attorney for Respondent William E. Barrow.*

**ZURN, Vice Chancellor.**

A sister challenged her brother's performance as their father's attorney-in-fact in their father's final years. After trial before a magistrate, both parties' exceptions present several questions for me to review de novo. First, I am asked to review de novo whether the brother engaged in self-dealing by naming himself the primary beneficiary on his father's retirement account. The preponderance of the evidence shows the brother was always the secondary beneficiary, and he only named himself the primary beneficiary after the original primary beneficiary died. I conclude the brother did not engage in self-dealing.

I am also asked to revisit whether the brother breached his fiduciary duties and was unjustly enriched in using his father's van to travel to work on his parents' properties; using his father's funds to buy groceries, gas, and beer when he was working on his parents' affairs; retaining his father's low-digit license plate; and providing his sister continuous access to his father's accounts, but not the formal reporting required by the power of attorney. As for the van, consumables, and reporting, I conclude he did not breach his fiduciary duties and was not unjustly enriched. There is good cause to expand the record on the point of whether the sister acquiesced to the license plate transfer.

## I. BACKGROUND[1]

Ralph Welton Barrow, Jr. and his wife Anna Lee Ernest Barrow built a legacy of four children and a substantial estate.[2] Petitioner Barbara Thompson is one of those children; respondent William E. Barrow is another.[3]

On June 3, 1992, Ralph and Anna executed their respective wills and trusts,

---

[1] On review of exceptions to a magistrate's post-trial final report, I have conducted a de novo review and concluded the following facts were proven by a preponderance of the evidence. *See DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted). "Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief." *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

This opinion refers to members of the Barrow family by their first names in pursuit of clarity. I intend no familiarity or disrespect.

Citations in the form "Rep." refer to the Magistrate's Final Post-Trial Report available at docket item ("D.I.") 49. Citations in the form "Tr." refer to the trial transcript available at D.I. 47 and D.I. 48. Citations in the form "POB" refer to the Petitioner's Opening Brief in Support of Exceptions to the Magistrate's Post-Trial Final Report Dated May 2, 2025, available at D.I. 57. Citations in the form "ROB" refer to Respondent William E. Barrow's Opening Brief in Support of His Exceptions to the Magistrate's Post-Trial Final Report Dated May 2, 2025 and Answering Brief in Opposition to Petitioner's Exceptions, available at D.I. 58. Citations in the form "PRB" refer to Petitioner's Combined Reply Brief in Support of Exceptions to the Magistrate's Post-Trial Final Report Dated May 2, 2025 and Answering Brief in Opposition to Respondent's Exceptions, available at D.I. 60. Citations in the form "RRB" refer to Respondent William E. Barrow's Reply Brief in Opposition to Petitioner's Exceptions, available at D.I. 64. Citations in the form "JX" refer to joint trial exhibits. Citations in the form "PX" refer to an exhibit Petitioner entered into evidence at trial.

[2] Tr. 8–9.

each leaving all property to the surviving spouse and, upon the survivor's death, to their four children in equal shares; both wills named William and Barbara as co-executors of each parent's estate, and co-trustees of the trusts.[4]

In their final years, Ralph and Anna turned to their children to help make decisions for them.[5] In 2018, Ralph executed a valid and operative power of attorney naming William as his agent (the "POA").[6] William has a bachelor's degree in finance, and owned his own computer-aided engineering design consulting firm.[7]

Ralph's POA included a section titled "Periodic Reports":

My agent shall prepare written, semi-annual reports regarding my finances, including income received and expenses incurred by my agent for me during the previous six-month period. These reports shall be mailed within 30 days of the end of each six-month period to Barbara . . . .[8]

William also signed an Agent's Certification in which he promised to "keep a full and accurate record of all actions, receipts and disbursements on behalf of" his father "in the absence of a specific provision to the contrary" in the POA.[9]

---

[3] *Id*.

[4] *Id*. at 19–22, 27–29, 257–58; JX M.

[5] Tr. 10–13, 25–27.

[6] *Id*. at 10–13, 42–43, 368; JX K.

[7] Tr. 7–8.

[8] JX K at 3.

[9] Tr. 69–70; PX 5.

4

**A. William's Service as Attorney-In-Fact**

Ralph suffered from dementia in his final years, so William had occasion to act as Ralph's attorney-in-fact.[10]  Ralph and Anna moved out of their primary residence in Newark, Delaware to obtain more care in the fall of 2019.[11]  William created a joint bank account for Ralph and himself in July 2019.[12]  William frequently went to the Newark residence and a vacation home in Ocean View, Delaware to maintain and clean out the properties, pick up mail, and pay his parents' bills—what William called "the company business."[13]  William used Ralph's van to travel to both properties, and used Ralph's funds for the van's gas and maintenance, rather than using his own car and requesting reimbursement.[14] William used the van for one personal golf trip, but paid for the gas himself.[15]

William also used Ralph's funds to pay for food and beer for himself when he was working on his parents' properties and finances.[16]  This was consistent with Ralph's own generosity to those who helped him.[17]  Before Ralph's decline, when

---

[10] Tr. 24, 30.

[11] *Id*. at 18, 24.

[12] *Id*. at 96–97, 103.

[13] *Id*. at 76, 116, 205–07.

[14] *Id*. at 76–77, 117–18, 344.

[15] *Id*. at 116.

[16] *Id*. at 77–78, 205–06.

[17] *Id*. at 77–78.

Ralph's children helped him at the Ocean View property, he insisted on feeding them and taking them to the VFW Post for drinks.[18] In William's words, using Ralph's funds to pay for refreshment while he was helping his father "was consistent with what [his] father would do if he was still able to do it."[19]

In or about March 2021, William sold Ralph's van and truck to CarMax,[20] and transferred the van's license plate to himself, but did not pay the transfer expenses himself.[21] This license plate has some value in Delaware: it begins with PC and has only four digits.[22] A vehicle Anna had owned also had a low digit Delaware license plate; William facilitated the sale of that car to Ralph's grandson, and the plate was transferred to William's sibling, the grandson's father.[23]

Anna died in February 2020.[24] After her death, but while Ralph was still living, William closed out her accounts at USAA.[25] In the middle of 2020,

---

[18] *Id*. at 77–78.

[19] *Id*. at 77.

[20] *Id*. at 118–20.

[21] *Id*. at 120.

[22] *See id*.; ROB 11 n.40 (offering a valuation for that tag of between $1,500 and $3,000).

[23] Tr. 121–22. Neither party challenges the transfer of the plate from Anna's car.

William's briefing on exception swaps who received which plate: it contends, without record citation, that the plate he received was from Anna's vehicle, while his brother received the one from Ralph's car. ROB 11; RRB 8. William's uncontroverted sworn trial testimony supports the findings of fact above.

[24] Tr. 18.

[25] *Id*. at 142–43, 184.

William obtained online access to Anna's USAA accounts to do so; that logon was also linked to Ralph's USAA accounts, including Ralph's IRA.[26] When William logged on, he saw the "beneficiaries" tab for Ralph's IRA listed Anna as the primary beneficiary and William as the secondary beneficiary—it "jumped out at [him]."[27] William "immediately" told his siblings he was the secondary beneficiary on Ralph's IRA, and that he would split the money among the four siblings.[28] William and the siblings all knew the funds in Ralph's IRA would pass to William as secondary beneficiary, because Anna had died.

In the process of notifying USAA of Anna's passing to close out her accounts, William told USAA on a phone call that Anna was the primary beneficiary of Ralph's IRA, and USAA removed Anna as primary beneficiary.[29]

In the summer or fall of 2020, Victory Capital Management ("VCM") bought USAA's business line that serviced Ralph's IRA.[30] USAA directed William, as Ralph's attorney-in-fact, to create an online account with VCM, which he did in November 2020.[31] Most of the account information was prepopulated,

---

[26] *Id*. at 81–82, 133, 140–42, 144, 184.

[27] *Id*. at 138–39, 145, 148.

[28] *Id*. at 145, 185–86, 313–14, 348–49; *but see id.* at 270, 288.

[29] *Id*. at 141–44.

[30] *Id*. at 81, 141.

[31] *Id*. at 146, 187–88; JX Q.

but the primary beneficiary field was blank.[32]  William designated himself as the account's primary beneficiary.[33]  He did so to replicate the designations he had seen at USAA, but updated to reflect that Anna had died.[34]  He remained the account's secondary beneficiary, even though he did not input that information himself on VCM's website.[35]

Ralph died in June 2021.[36]  Upon his death, the roughly $43,000 in his VCM IRA were transferred to William, who reinvested them as a beneficiary IRA.[37]

During William's tenure as Ralph's attorney-in-fact, he did not send any semi-annual reports as the POA described them.[38]  But he offered Barbara access to Ralph's investment account statements,[39] gave her contemporaneous online access to Ralph's accounts,[40] added her to Ralph's joint account with William,[41] and was "transparent with regard to what was occurring with the account."[42] William kept his siblings apprised of how he was handling his parents' estate, and

---

[32] Tr. 151, 157, 324; JX G at 1.

[33] Tr. 138.

[34] *Id.* at 138, 150–52, 323–24.

[35] *Id.* at 189–90; JX G at 9.

[36] Tr. 23.

[37] *Id.* at 133–34, 207.

[38] *Id.* at 58, 62–65, 334.

[39] *Id.* at 63, 82.

[40] *Id.* at 58, 82, 113–15, 172, 284–86.

[41] *Id.* at 113, 266–67, 340.

strategic decisions were made as a family.[43]  He also consulted with his parents' counsel and financial advisors, until his parents' counsel had to withdraw due to a conflict presented by this litigation.[44]

**B. Disputes Arise**

Barbara first started asking William for more financial information in June and July 2021, presumably in her capacity as executor of Ralph's estate.[45]  Barbara started asking questions after she expressed interest in buying the Ocean View property and William, as Ralph's agent, told her it was not for sale.[46]

William asked Barbara how she would like the information presented, but got no response.[47]  At that time, Barbara already had access to Ralph's accounts.[48] In August 2021, William provided her with the check register for Ralph's joint account, which Barbara found insufficient.[49]  William again asked what more she wanted but got no response.[50]  William also directed his financial advisor to give Barbara complete access to Ralph's file, and that advisor sent Barbara information

---

[42] *Id.* at 310; *accord id.* at 316, 334, 337.

[43] *Id.* at 80–81, 97, 100–02, 111–12, 131–32, 218–19, 313–14.

[44] *Id.* at 91–93, 101; 122–23, 134–36.

[45] *Id.* at 62–65, 173–74, 193–94; PX 3.

[46] Tr. 62–65, 173–74, 193–94.

[47] *Id.* at 65.

[48] *Id.* at 58, 82, 113–15, 172, 266–67, 284–86.

[49] *Id.* at 65–66, 174; PX 4.

9

accordingly.[51] Barbara did not ask about the license plate.[52]

On April 10, 2023, Barbara sued William for breach of fiduciary duty and unjust enrichment, seeking retitling of the VCM account, an accounting, and a constructive trust.[53] Her complaint did not mention the license plate.[54] After Barbara sued William, he decided to keep the funds from Ralph's IRA rather than split them among his siblings.[55]

Trial was held before a magistrate on January 7 and 8, 2025.[56] Barbara's counsel asked William about the license plates at trial.[57] The magistrate issued the final post-trial report on May 2. The final report held William breached his fiduciary duties by failing to provide Barbara regular accountings, by transferring the license plate to himself, by using Ralph's van, and by using Ralph's funds for groceries and beer.[58] The final report concluded Barbara did not meet her burden to prove William named himself primary beneficiary of Ralph's IRA.[59] Both

---

[50] Tr. 66.

[51] *Id*. at 176–77.

[52] PX 3.

[53] D.I. 1.

[54] *Id*.

[55] Tr. 186–87, 207, 349–50.

[56] D.I. 43.

[57] Tr. 118–22.

[58] Rep. 24–31.

[59] *Id*. at 21–24.

parties took exception, and the briefing on exceptions closed on August 19.[60] Barbara's first written submission addressing the license plate transfer was her briefing on exception.[61]

## II.   ANALYSIS

The parties' exceptions present three questions for my consideration. The first is whether Barbara met her burden to prove William's designation of himself as the VCM primary beneficiary was a self-dealing transaction. The second is whether the preponderance of evidence shows William breached his fiduciary duties in using Ralph's van and funds to pay for groceries, gas, and beer, and in transferring Ralph's license plate to his own car. The third is whether the preponderance of evidence shows William breached his reporting duties as Ralph's attorney-in-fact.

### A. The VCM Transaction

Barbara contends William breached his fiduciary duty on the grounds that he "acted in his own self-interest and engaged in self-dealing when he took actions to name himself as the sole beneficiary of [Ralph's] VCM accounts."[62] William took that action as Ralph's agent under the POA.

"The creation of a power of attorney imposes the fiduciary duty of loyalty on

---

[60] D.I. 50; D.I. 51; D.I. 57; D.I. 58; D.I. 60; D.I. 64.

[61] PRB 6.

11

the attorney-in-fact."[63]  William owed these fiduciary duties to Ralph.[64]

> The common law fiduciary relationship created by a durable power of attorney is like the relationship created by a trust.  The fiduciary duty principles of trust law must, therefore, be applied to the relationship between a principal and her attorney-in-fact.  An attorney-in-fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney-in-fact engaging in an interested transaction after full disclosure.[65]

In this context, "self-dealing occurs when the fiduciary has a 'personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in material connection.'"[66]  "An attorney-in-fact who uses the power given to [him] by the principal to transfer assets to [him]self has committed improper self-dealing, absent the voluntary and knowing consent of the principal."[67]  The POA itself states, "My agent may not benefit personally from any transaction engaged in on my behalf."[68]

"A party bringing a claim for fiduciary breach generally has the burden of proving each element, including damages, of each of [her] causes of action . . . by a

---

[62] D.I. 1 ¶ 29.

[63] *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999).

[64] Barbara has standing to sue for injury to Ralph as co-executor of Ralph's estate.  *See* 12 *Del. C.* §§ 49A-114(g), 49A-116; *Rende v. Rende*, 2023 WL 2180572, at *15 n.175 (Del. Ch. Feb. 23, 2023).

[65] *Schock*, 732 A.2d at 225.

[66] *Stegemeier v. Magness*, 728 A.2d 557, 564 (Del. 1999) (internal citation omitted).

[67] *Pennewill v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011).

preponderance of the evidence."[69] The petitioner bears the burden of proving the agent engaged in self-dealing by a preponderance of the evidence.[70]

Self-dealing on the part of an agent under a power of attorney is "virtually prohibited."[71] "In view of the difficulty of unraveling fraud in these transactions, the policy of the rule is to exclude the possibility of it by making the prohibition absolute."[72] Once a transaction is identified as self-dealing, it is voidable at the behest of the beneficiary.[73]

"Where an attorney in fact engages in a self-dealing transaction without the informed consent of the principal, the attorney in fact bears the burden of persuasion to justify upholding the transaction."[74] "[T]he fact that such a transaction is voidable only, and not void, indicates that there can be exceptions to even this restrictive rule of law where the circumstances justify it."[75] The Court will uphold an agent's self-dealing transaction if the agent can show the transaction

---

[68] JX K at 4.

[69] *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10 (Del. Ch. Sept. 29, 2020).

[70] *Id.*; *accord Estate of Carpenter v. Dinneen*, 2007 WL 2813784, at *7 (Del. Ch. Apr. 11, 2007).

[71] *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) (enunciating that standard in the context of trust law).

[72] *Downs v. Rickards*, 4 Del. Ch. 416, 430 (Del. Ch. 1872).

[73] *Schock*, 732 A.2d at 225, 228–29; *Stegemeier*, 728 A.2d at 563.

[74] *Estate of Carpenter*, 2007 WL 2813784, at *7.

[75] *Vredenburgh v. Jones*, 349 A.2d 22, 33 (Del. Ch. Nov. 26, 1975).

was fair and the transaction was approved by the principal, after full disclosure.[76] Where the agent and principal are in a particularly close relationship, the principal's approval must follow receipt of impartial advice from a competent and disinterested third person, sufficient to enable the principal to make an informed judgment.[77]

If the principal is not party to the case, a court of equity has the power to approve a transaction on the principal's behalf if it finds the transaction to be in the principal's best interest.[78] Court approval in the principal's absence can be "before-the-fact,"[79] but need not be.[80]

On exception, the parties join issue on whether Barbara met her burden to show William's self-identification as the VCM primary beneficiary was self-dealing. The preponderance of the evidence at trial shows William would have received the funds in Ralph's IRA even if he had not named himself primary beneficiary. The evidence shows William was named the secondary beneficiary

---

[76] *See Stegemeier*, 728 A.2d at 563 (addressing preapproval from the grantor or beneficiaries in the trust context); *Schock*, 732 A.2d at 225.

[77] *Dorman v. Plummer*, 2001 WL 32645, at *6 (Del. Ch. Jan. 9, 2001); *Faraone v. Kenyon*, 2004 WL 550745, at *11 (Del. Ch. Mar. 15, 2004).

[78] *Oberly*, 592 A.2d at 466; *Stegemeier*, 728 A.2d at 563; *Equitable Tr. Co. v. Gallagher*, 102 A.2d 538, 545 (Del. 1954).

[79] *Stegemeier*, 728 A.2d at 563 (addressing court approval where the principals were present).

[80] *Vredenburgh*, 349 A.2d at 42.

while the account was at USAA, and after it was transferred to VCM.[81] William testified to that fact, and VCM documents support it.[82] William testified he "immediately" told his siblings at a family meeting that he was named the USAA secondary beneficiary.[83] Another sibling, who was sequestered for William's testimony, testified William told the siblings he learned he was secondary beneficiary "the first time he had checked," and that William was "surprised."[84] There is no evidence that William named himself secondary beneficiary at USAA or at VCM. The evidence at trial demonstrated William simply updated the primary beneficiary on Ralph's IRA account after Anna's passing.

William did not benefit from doing that. William did not transfer Ralph's IRA to himself by naming himself primary beneficiary. When he did that, he was already the secondary beneficiary, and Anna had already died. William was going to receive the funds anyway. Put differently, William did not actually transfer Ralph's IRA to himself; somebody else, perhaps Ralph, did that by naming

---

[81] In discovery in this action, USAA could not provide any documents showing the account's beneficiary designations while the account was at USAA. Tr. 138–39, 148–49, 158–59, 187. In some circumstances, holes in discovery can be suspicious and support a factual inference that the undocumented event did not actually occur. Not here. No party was able to obtain any documents about the account from USAA. That was very frustrating for William. *Id.* at 139, 150, 187. I give zero weight or meaning to the absence of documentary evidence showing William was the secondary beneficiary while the account was at USAA.

[82] *Id.* at 145–58, 189–90; JX F; JX G.

[83] Tr. 145, 185–86.

15

William the secondary beneficiary at USAA. That designation became operative when Anna died, and that designation transferred to VCM. Barbara failed to prove William's self-designation as the primary beneficiary was a self-dealing transaction. Her exceptions are dismissed.

## B. The Van, Consumables, and License Plate

William's exceptions ask the Court to revisit whether his use of Ralph's van and funds amounted to a breach of the fiduciary duties he owed Ralph under the POA. The preponderance of the evidence shows that apart from one golf trip, William's use of the van was for Ralph's benefit. It follows his use of Ralph's funds for the van's gas and maintenance was also for Ralph's benefit. That use was not self-dealing.

William's use of Ralph's funds to pay for his own food and refreshments constituted a use of Ralph's assets for William's personal benefit, and therefore amounted to self-dealing. So those transactions are voidable in equity. Under the no-further-inquiry rule, there are only a few offramps from voiding self-dealing transactions. One is for William to show they were fair and preapproved or ratified by Ralph after receiving full disclosure.[85] Given Delaware's strict prohibition on self-dealing, and William's close relationship with Ralph, those approval and

---

[84] *Id*. at 313–14, 348–49.

[85] *Stegemeier*, 728 A.2d at 563.

16

ratification requirements are stringent. It is not enough to show the principal likely would have approved the transactions; rather, the agent must show the principal actually consented to the transactions after full disclosure.[86]

William used Ralph's funds to buy food and refreshment for himself while working on his parents' affairs. It was Ralph's practice to buy his kids food and drink when they came to help him.[87] But the trial record affords no basis to conclude that Ralph preapproved or ratified William's specific transactions under the POA. Given Ralph's deteriorating health at the time, such knowing consent may not have been possible. The trial record does not support the conclusion Ralph gave knowing consent to those particular transactions.

Because Ralph is only a part of this case in memory, there is another offramp from voiding the transactions. In Ralph's absence, this Court can approve the transactions if it finds they were in Ralph's best interest.[88] I conclude they were.

The preponderance of the evidence at trial proves Ralph showed hospitality to his kids when they helped him, and that doing so was important to Ralph. According to everyone except Barbara, who has an ax to grind about the Ocean

---

[86] *Schock*, 732 A.2d at 224–26; *Stegemeier*, 728 A.2d at 563; *e.g.*, *Dorman*, 2001 WL 32645, at \*5–6; *Lingo v. Lingo*, 2009 WL 623720, at \*11 (Del. Ch. Feb. 26, 2009); *Faraone*, 2004 WL 550745, at \*11.

[87] Tr. 77–78.

View property, William was a faithful and diligent caretaker of Ralph's property.[89]

He devoted substantial time and energy to the "company business" in Ralph's best interest, and used some of Ralph's funds on food and drink while doing so—the way Ralph would have wanted. It was important to Ralph that he buy his kids a beer when they came to help him.[90] Based on the tenor of William's testimony, it is reasonable to infer that having his dad buy him a beer after working on his dad's "company business," the way William used to have one with Ralph after they finished a task, made William feel connected to his father. I conclude in equity that these de minimus expenditures were in Ralph's best interest. I approve them, rather than void them. William is not liable for those expenditures.

William's transfer of Ralph's low-digit Delaware license plate to himself was a self-dealing transaction. So the transfer is voidable at Ralph's estate's behest, unless William can convince the Court an offramp applies. There is no evidence that Ralph gave his informed consent to the transfer of the plate; nor is there any basis for me to conclude that transfer was in Ralph's best interest.

William offers two other reasons the Court should not void the transfer.

[88] *Stegemeier*, 728 A.2d at 563; *Oberly*, 592 A.2d at 466; *Gallagher*, 102 A.2d at 545.

[89] Tr. 316, 346.

[90] *Id*. at 77–78.

While neither succeeds at this juncture, one has legs.[91] William argues all three of his siblings, including Barbara, knew of, and did not object to, the transfer, thereby acquiescing.[92] A claimant's acquiescence can validate a voidable act of self-dealing.[93] Acquiescence is also a defense to unjust enrichment.[94]

William first asserted Barbara knew about the license plate transfer, with the inference that this led him to believe it was approved, in briefing on exception.[95] Barbara did not dispute those facts: she only argued the siblings' failure to object was "immaterial" as a matter of law.[96]

---

[91] William's defense that the plate transfer was not "substantial" fails. ROB 11. Delaware fiduciary law does not excuse self-dealing merely because the personal benefit is small. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995) ("Regardless of the possibly *de minimus* nature of the benefit conferred, the receipt of improper benefits suffices to prove their participation in the alleged breaches of fiduciary duties.").

[92] ROB 11; RRB 8.

[93] *Glass v. Baker*, 2024 WL 687755, at *15 (Del. Ch. Feb. 9, 2024) (internal quotation marks omitted); *accord Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1045–47 (Del. 2014) (citations omitted).

[94] *See* 42 C.J.S. *Implied Contracts* § 8 ("Unjust enrichment is principally an equitable doctrine, and recovery may be subject to various equitable defenses[.]"); 66 Am. Jur. 2D *Restitution and Implied Contracts* § 21, Westlaw (database updated May 2025) ("An unjust-enrichment claim is equitable in nature, and the right to restitution is therefore subject to any counter-equities that the recipient of benefits may assert."); *Rsrv. Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 524–25 (Del. 2008) (affirming the denial of damages on an unjust enrichment claim based on the equitable defense of unclean hands); *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *12–14 (Del. Ch. Feb. 18, 2015) (holding that unjust enrichment claim is barred by laches); *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001) ("Acquiescence is an equitable defense.").

[95] ROB 11; RRB 8.

[96] PRB 6.

But William's brief is not a vehicle for introducing facts. The trial record before the Magistrate does not offer any basis to conclude Barbara knew William transferred Ralph's tag to himself, or how that affected William.[97] The record on exceptions is limited to "the record before the Magistrate in Chancery, unless the Reviewing Judge determines to expand the record for good cause shown."[98]

I believe there is good cause to expand the record here. Barbara's counsel brought up the license plate for the first time at trial.[99] The parties did not engage in post-trial briefing before the Magistrate. The Magistrate found William breached his fiduciary duties and was unjustly enriched by transferring the license plate to himself.[100] William's first opportunity to respond to that theory was on exception. Barbara's responsive brief did not dispute that she knew about the license plate transfer at the time of the transfer, or that her silence would lead William to think it was approved.[101] And Barbara's acquiescence would be dispositive.[102]

---

[97] *See* Tr. 119–22.

[98] Ct. Ch. R. 144(e).

[99] Tr. 199–22.

[100] Rep. 24.

[101] PRB 6.

[102] To prove Barbara acquiesced in her capacity as Ralph's executor, William must prove that Barbara, with full knowledge of her rights and the material facts, (1) remained inactive for a considerable time, (2) freely engaged in acts amounting to recognition of the complained-of act, or (3) acted in a manner inconsistent with a subsequent

20

It appears Barbara knew about the license plate transfer in 2021, acquiesced, then surprised William with an attack on that transfer for the first time at trial in 2025, securing a holding that William breached his fiduciary duties without consideration of Barbara's acquiescence. Here, that circumstance comprises good cause to open the record on exception. William may submit an

---

repudiation of the complained-of act. *Klaassen*, 106 A.3d at 1047. In addition, the claimant's acts must "lead[ ] the other party to believe the act has been approved." *Id.*

If Barbara knew about William's license plate transfer in March 2021, she had knowledge of those material facts and her rights as Ralph's executor by June 2021. It appears she started needling William about Ralph's finances in June 2021, but did not include the license plate in her April 2023 complaint, opting instead to raise it for the first time at trial in January 2025. That is well beyond what Delaware decisions deem a "considerable time." *See, e.g.*, *id.* at 1045–48 (holding knowing inaction for 17 months constitutes acquiescence). It is possible, perhaps even likely, that Barbara's prolonged and knowing silence on the license plate, even as she gnawed at William's handling of Ralph's finances, would lead William to believe the act was approved. *See id.* at 1047. Barbara's course of conduct demonstrates her intention and motivation was to needle William, not to rectify any real injustice to Ralph or his estate. Her trial by ambush on the license plate point should not be rewarded. *See Hoey v. Hawkins*, 332 A.2d 403, 406–07 (Del. 1975) (holding a party's "failure to update responses short-circuits [the discovery] mechanism and lays the groundwork for trial by ambush," and warning that to permit such tactics "would be to condone the surprise-advantage" gained by flouting discovery rules); *Concord Towers, Inc. v. Long*, 348 A.2d 325, 326 (Del. 1975) (refusing to consider a key eyewitness statement withheld until the third day of trial, because unfair surprise arising from a discovery violation "is not to be condoned").

A related note on pleading requirements. Generally, a party arguing acquiescence as an affirmative defense must state their claim in their answer; William did not. Ch. Ct. R. 8(c); D.I. 10. But Barbara raised the license plate issue for the first time at trial, and did not object to addressing William's acquiescence defense on the merits. Tr. 119–22; ROB 11; PRB 6–7. Court of Chancery Rule 15(b) permits amendment of the pleadings when the "presentation of the merits of the action" will be facilitated. Ct. Ch. R. 15(b). Amendment to reflect any new issues not asserted in the pleadings is within my discretion, so long as the responding party is not prejudiced by its admission. *Id.*; *Norberg v. Sec. Storage Co. of Wash.*, 2000 WL 1375868, at *5 (Del. Ch. Sept. 19, 2000). Amendment to permit William's acquiescence defense is proper here.

21

affidavit offering facts as to what Barbara knew, when she knew it, and how that knowledge affected him. Barbara may file a responsive affidavit as to what she knew, when she knew it, and if there was any effect on William.[103] If the affidavits present a dispute of fact, further testimony will need to be taken.

### D. William's Reporting Duties

Finally, William's exceptions inspire de novo review of whether he breached his fiduciary duties by failing to provide the formal six-month reports called for in the POA, and the information that must be provided upon request under 12 *Del. C.* § 49A-114(g).

I begin with William's statutory duties. Section 49A-114(g) states:

> (g) Except as otherwise provided in the personal power of attorney and by § 49A-108(b) of this title, an agent is not required to disclose receipts, disbursements, or transactions conducted on behalf of the principal unless ordered by a court or requested by the principal, a guardian, a conservator, another fiduciary acting for the principal, a governmental agency having authority to protect the welfare of the principal, or, upon the death of the principal, by the personal representative or successor in interest of the principal's estate. If so requested the agent shall comply with the request within a reasonable period of time.

Barbara first asked for financial information in June and July 2021, after Ralph died, presumably in her capacity of co-executor of, or successor to, Ralph's estate.[104] At that time, she already had access to Ralph's accounts.[105] In response

---

[103] Barbara should be mindful of the potential for fee shifting if she proceeds in bad faith.

[104] Tr. 58, 62–65, 173–74; PX 3.

to Barbara's request, William promptly gave Barbara the check register to Ralph's joint account.[106] William disclosed the transactions on Ralph's behalf to Barbara, in real time and, redundantly, after she asked; and Barbara has made no showing that the information she received was incomplete.[107] William satisfied his statutory duty of disclosure.

William also owed disclosure obligations under the POA to provide Barbara with "written, semi-annual reports" of "income received and expenses incurred."[108] The POA is a contract. "Delaware courts interpret contract language from the perspective of an objective and reasonable third party. Powers of attorney, however, are construed more strictly than ordinary contracts. The principal's intent controls the interpretation of the instrument."[109] At the same time, Barbara's claim is one for breach of fiduciary duty: that is an equitable claim, and it is a

---

[105] Tr. 58, 82, 113–15, 172, 266–67, 284–86.

[106] *Id*. at 65–66, 174–75, 244–45.

[107] *See In re Estate of Dougherty,* 2016 WL 4130812, at \*12 (Del. Ch. July 22, 2016) (ordering a formal accounting where the fiduciary engaged in egregious financial exploitation and "made no effort to obtain bank records or copies of receipts or bills," offered no other evidence, and attempted to substitute a "narrative" and deposition answers for a proper accounting); *In re DeGroat*, 2020 WL 2078992 at \*7–11, 23 (Del. Ch. Apr. 30, 2020) (ordering a new accounting where the fiduciary consistently took the decedent's assets, including diverting the decedent's retirement and investment funds into her own accounts, liquidating and borrowing against his life insurance for personal use, charging over $70,000 in personal expenses to his credit card, and taking all $402,000 in sale proceeds from jointly owned real estate, yet "did not produce any documentation or witnesses to justify or explain any of her self-dealing financial transactions").

[108] JX K at 3.

23

maxim of equity that "equity regards substance rather than form."[110]

Ralph intended William to disclose his income and expenses twice a year to Barbara. William did not do that: he did more than that. He gave Barbara real-time access to that information.[111] Ralph's intent was satisfied. And when comparing the substance of William's disclosures to Barbara, rather than their form, it is clear he met his disclosure obligations. William did not breach his disclosure obligations under the POA. There is no reason to order him to perform a duplicative accounting.

## III. CONCLUSION

Barbara's exceptions on the VCM beneficiary designation are **DISMISSED.** William's exceptions on the van, gas, food and beer, and the disclosure obligations are **SUSTAINED.** The record is **EXPANDED** on William's exceptions on the license plate. The parties shall submit the requested affidavits on a stipulated schedule. Jurisdiction is **RETAINED.** To the extent an order is necessary to effectuate this opinion, **IT IS SO ORDERED.**

---

[109] *Estate of Carpenter*, 2007 WL 2813784, at *8.

[110] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").

[111] Tr. 58, 62–65, 82, 113–15, 172, 266–67, 284–86.